IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CHRISTOPHER INNISS and SHELTON STROMAN; RAYSHAWN CHANDLER and AVERY CHANDLER; MICHAEL BISHOP and JOHNNY SHANE THOMAS; and JENNIFER SISSON, on behalf of themselves and all others similarly situated,<br><br>        *Plaintiffs*,<br><br>       v.<br><br>DEBORAH ADERHOLD, in her official capacity as State Registrar and Director of Vital Records; BROOK DAVIDSON, in her official capacity as Clerk of Gwinnett County Probate Court; and the Honorable Judge PINKIE TOOMER, in her official capacity as Judge of Fulton County Probate Court,<br><br>        *Defendants*. | Civil Action No. _____<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**CLASS ACTION** |

**CLASS ACTION COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF**

# INTRODUCTION

1.      Named Plaintiffs Christopher Inniss and Shelton Stroman, RayShawn Chandler and Avery Chandler, Michael Bishop and Johnny Shane Thomas, and Jennifer Sisson bring this civil rights action pursuant to 42 U.S.C. § 1983 on behalf of themselves and the proposed Plaintiff Class for the violation of their rights under the Fourteenth Amendment to the United States Constitution caused by the State of Georgia's exclusion of same-sex couples from (1) the freedom to marry and (2) the recognition of lawful marriages entered in other jurisdictions.

2.      The history of the United States has been defined by the ability of each succeeding generation to recognize that social, economic, political, religious, and historical norms do not define our unalienable rights.  As adopted in 1789, the Constitution of the United States permitted slavery, and allowed states to deny the majority of our adult citizens the right to vote, to criminalize inter-racial marriage, and to criminalize private consensual intimacy.  But in time, the American ideal of equality and liberty demanded that our government move past cultural and majority oppressions, however long-standing, in order to secure and fulfill the individual rights of all citizens.

3.      With the adoption of the Fourteenth Amendment in 1868, our Constitution provided not only a more expansive definition of citizenship, but also

1

the framework for assuring our Founders' "self-evident" truth of liberty and equality:  "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

4.     Guided by this framework, the United States Supreme Court has vindicated the right to marry as "fundamental" and one of the "basic civil rights of man."  *Loving v. Virginia*, 388 U.S. 1, 12 (1967), *quoting Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942).  Its decisions have made clear that "the freedom of personal choice in matters of marriage and family life is one of the liberties" protected by the Fourteenth Amendment.  *Zablocki v. Redhail*, 434 U.S. 374, 393 (1978).

5.     By this Complaint, Named Plaintiffs seek to enforce these rights and liberties.  They ask this Court to hold that the State of Georgia cannot condition marriage on the sex of spouses.

6.     Named Plaintiffs Christopher Inniss and Shelton Stroman and Named Plaintiffs Michael Bishop and Johnny Shane Thomas are loving, committed same-sex couples who seek the right to marry in the State of Georgia.

7.      Named Plaintiffs RayShawn Chandler and Avery Chandler and Named Plaintiff Jennifer Sisson, a recent widow, are individuals who lawfully married a same-sex spouse outside the State of Georgia, but who reside in the State and seek its respect for and recognition of their marriages.

8.      Named Plaintiffs bring this action pursuant to on behalf of themselves and the Plaintiff Class defined in Section IV below (collectively, "Plaintiffs").

9.      Marriage plays a unique role in our society as the celebration and hallmark of a couple's commitment to build family life together.  It confers dignity, status, rights, and responsibilities.  Plaintiffs have formed or want to form enduring bonds worthy of the respect that the State affords to different-sex couples through marriage.  Yet the State has deprived lesbian and gay Georgians of the right to marry their chosen partners and declines to recognize lawful marriages entered in other jurisdictions based on sexual orientation and sex.  The State's discriminatory "marriage bans" are enshrined in Georgia statutes and in Georgia Constitution art. I, § IV, para. I, which limits marriage to couples composed "of man and woman."

10.     The marriage bans inflict serious and irreparable harms upon same-sex couples and their children that cannot be explained by reference to legitimate governmental interests.

3

11.     Same-sex couples are identical to different-sex couples in all characteristics relevant to marriage.

12.     Same-sex couples make the same commitment to each other as different-sex couples.  Like different-sex couples, same-sex couples fall in love, build their lives together, plan their futures together, and hope to grow old together.  Like different-sex couples, same-sex couples support each other emotionally and financially, and take care of each other when faced with injury or illness – as, for example, Named Plaintiff Jennifer Sisson did for her terminally ill spouse, Pamela Drenner.

13.     Same-sex couples seek to marry for the same emotional and romantic reasons and the same reasons of dignity as different-sex spouses.  They desire to declare their love and commitment before their families, friends, and community, and to obtain the status, security, protections, and responsibilities of marriage.

14.     Like some different-sex couples, some same-sex couples, including some Named Plaintiffs, are parents raising children together.  These couples and their children are equally worthy of the tangible rights and responsibilities, as well as the respect, dignity, and legitimacy, that access to marriage confers on different-sex couples and their children.  For the many children born to or being raised by

same-sex couples, the tangible resources and societal esteem that marriage confers are no less necessary and precious than for children of different-sex couples.

15.     Our courts and our society have discarded, one by one, marriage laws that violated the United States Constitution's mandate of equality and liberty, such as anti-miscegenation laws and laws that denied married women independence and the right to make their own decisions.  History teaches us that the vitality of marriage does not depend on maintaining discriminatory laws – and that eliminating unconstitutional restrictions on marriage has enhanced the institution. Indeed, in 17 states and the District of Columbia, same-sex couples are legally marrying and the institution of marriage continues to thrive.

## I.      JURISDICTION AND VENUE

16.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the subject matters in controversy arise under the Constitution and laws of the United States.

17.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside within the Northern District of Georgia and a substantial part of the events that gave rise to Plaintiffs' claims took place in this District.

18.     This Court has personal jurisdiction over Defendants because they are domiciled in the State of Georgia.

5

19.    This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## II.    PARTIES

### A.    Named Plaintiffs

### *Christopher Inniss and Shelton Stroman*

20.    Named Plaintiffs Christopher Inniss, age 39, and Shelton Stroman, age 42, are a same-sex male couple residing in Snellville, Georgia.  Chris is a veterinarian and the Chief of Staff at the Banfield Pet Hospital in Loganville, Georgia.  Shelton is manager of the Snellville Pet Resort, a business the couple started together.

21.    Chris and Shelton met through a mutual friend in 2001, and have been a loving and committed couple for 13 years.  They are raising a 9-year-son, J.S.I., who is the highlight of their lives.  More than a decade ago, Chris proposed marriage to Shelton on a trip to celebrate Shelton's birthday.  Chris did not know where or how they could marry, but he wanted to show Shelton that he was committed to being with him forever.  Shelton had fallen in love with Chris's strength, compassion, and capacity for unconditional love, and he accepted the proposal, even though the men could not marry in their home state of Georgia.

22.     Chris and Shelton decided to live together as a couple and as a family. Their world changed when they adopted J.S.I. in 2004.  Today, J.S.I. is a happy, busy third-grader.  He is routinely on the honor roll at school, has a green belt in tae kwon do, and is eager to play basketball and football too.

23.     Chris and Shelton want to marry for several reasons, including to be recognized as a loving and committed couple without having to explain their relationship to others.  As parents, they want to be recognized as a family equal to others.  J.S.I. is old enough to understand that his parents are not married, and he struggles to understand why.  J.S.I. wants Chris and Shelton to be married like many of his friends' parents.  J.S.I. has been to weddings, and wants to participate in Chris and Shelton's wedding.  Chris and Shelton find it painful that they cannot fulfill his wish.

24.     Because Shelton doesn't share J.S.I.'s last name, staff at J.S.I.'s school often ask if he is J.S.I.'s uncle.  The same confusion occurs whenever they see a new dentist or doctor or complete family-related forms.  The couple has to modify forms to identify their relationship to their son and once were asked if they had made a mistake.  If Chris and Shelton were married and recognized as a family unit, this kind of confusion would be reduced or eliminated.

25.     Shelton tried to mitigate the situation by filing a petition to change his last name.  The judge berated him in open court for seeking to share a last name with another man and trying to "defeat" the court.  Shelton explained that he also wanted to change his last name to match that of his son, but the judge was unmoved, and ordered him to leave the courtroom.  As difficult as this experience was for Shelton, he and Chris are even more concerned that J.S.I. too will experience similar societal messages of disapproval.

### *RayShawn Chandler and Avery Chandler*

26.     Named Plaintiffs RayShawn Chandler, age 29, and Avery Chandler, age 30, are a same-sex female couple residing in Jonesboro, Georgia.  Avery enlisted as a U.S. Army reservist in 2008 and was recently promoted to Sergeant. In July 2014, she will deploy to Kuwait.  In civilian life, Avery works as a full-time Police Officer for the Atlanta Police Department ("APD") – and, in addition, serves as a member of the APD's Honor Guard, which presents the colors at functions in precision drill and helps bury the police force's fallen, including carrying the deceased officer's casket and presenting a flag to the family.  Avery's spouse, RayShawn, is also an APD Police Officer.  Her duties include mentoring at-risk youth during visits to their schools and homes, and monitoring their disciplinary records and living circumstances.  Avery and RayShawn are both

8

members of Volunteer! Decatur, through which they volunteer for community events, including book and arts festivals.

27.     RayShawn and Avery met in 2010 through the Atlanta Police Academy, and have been a loving and devoted couple for more than three years. In 2013, Avery proposed to RayShawn on April 12 – the birthday of RayShawn's grandmother, who was a central figure in RayShawn's life before she passed. RayShawn came downstairs that evening to find a digital picture frame Avery had programmed with pictures of them as a couple, RayShawn's grandmother, and finally, an engagement ring.  Avery, on bended knee, offered RayShawn the ring and asked RayShawn to marry her.

28.     The couple wanted a lawful marriage, which Georgia would not allow.  RayShawn and Avery chose Connecticut because they wanted to marry in a state neither had visited before – and to see a lighthouse together.  They were married in Elizabeth Park in West Hartford, Connecticut, on June 26, 2013, before a handful of close friends, and later had a ceremony and reception in Atlanta to celebrate with their friends and family.

29.     Having their marriage recognized in their home state of Georgia is important to RayShawn and Avery, especially now that they are planning for children, through their efforts for RayShawn to become pregnant through artificial

9

insemination.  The State's refusal to recognize their marriage burdens their family because Avery cannot be recognized on the birth certificate as the other parent of their children.  Avery and RayShawn also worry about the stigma their children will experience because of Georgia's refusal to recognize their marriage.

30.     Both RayShawn and Avery serve their community as law enforcement officers, and Avery also serves her country as a reservist.  These are difficult and dangerous jobs.  If, for example, Avery were killed in the line of duty as a Police Officer, RayShawn and their hoped-for children (unlike different-sex spouses and their children) would not qualify for State survivor's benefits.

### Michael Bishop and Johnny Shane Thomas

31.     Named Plaintiffs Michael Bishop, age 50, and Johnny Shane Thomas ("Shane"), age 44, are a same-sex male couple residing in Atlanta, Georgia. Michael is General Counsel for AT&T Intellectual Property Corporation, and Shane is a realtor who served in the Air National Guard.  Shane serves on the board of First Presbyterian Preschool, where their children attend school.  Michael is the incoming President of the Atlanta Intellectual Property Inn of Court, Chair of the Atlanta Advisory Council for Savannah College of Art and Design in Atlanta, and a member of the Board of Trustees for the Atlanta Preservation Center.

32.     Michael and Shane met in 2006 at a birthday party, and have been a loving, committed couple for over seven years.  They have welcomed two children into their family, including their nearly five-year-old son, T.A.B., and their three-and-a-half-year-old daughter, M.G.B.  Their lives revolve around their children. The couple wakes every day to two energetic children running around the house, and, like other parents, they spend the morning getting their children ready and off to school.  Michael and Shane take T.A.B. and M.G.B. to birthday parties at Chuck E. Cheese, to Piedmont Park and the Atlanta Botanical Gardens, to Saint Luke's Episcopal Church, to the beach, and – because Michael is a history buff – to historical sites like President Roosevelt's home in Warm Springs, Georgia. Michael and Shane tell their children, "We adopted you because we love you *so* much," and their son once answered, "No, I adopted *you*."

33.     Michael and Shane want to marry to express their devotion to each other and to obtain the dignity and legitimacy of marriage for their children. Michael and Shane worry that, as T.A.B. and M.G.B. get older, they will realize that their friends' parents are married, while the law treats their parents as "less than."  Michael and Shane do not want their children to carry a sense of uncertainty, inferiority, or shame because they know their parents cannot secure their relationship through marriage.  Michael and Shane also worry about what

11

might happen in the event of a medical emergency, especially if their relationship to the children is questioned.  Although they carry their children's adoption papers and advanced medical directives when they travel, they long for the day when taking such steps is unnecessary, and their family bonds are recognized.

### Jennifer Sisson

34.     Named Plaintiff Jennifer Sisson, age 34, recently lost the love of her life when her spouse, Pamela Drenner, age 49, passed away after a long battle with ovarian cancer.  Although Jennifer and Pam knew their home state of Georgia would not recognize their marriage, they wanted to memorialize their commitment and love for each other.  They were married on Valentine's Day 2013 in New York at City Hall, surrounded by a few cherished friends and family members.

35.     Pam was diagnosed with ovarian cancer in 2008, but had undergone successful treatment.  Jennifer knew that Pam could become sick again, and believed strongly in the commitment she made to love and care for Pam in sickness and in health.

36.     In April 2013, two months after the couple married, tumors appeared again on Pam's scans.  Her health seriously declined in November 2013.  Jennifer took a leave of absence from her work with Delta Airlines to become Pam's full-time caretaker.

12

37.    Aside from once-weekly visits from a nurse, Jennifer took care of almost everything for Pam.  She administered Pam's medication, fluids, and nutrition through intravenous ("IV") lines.  She helped Pam go to the bathroom, and bathed and dressed her.  By February 2014, Pam began to require around-the-clock care.  During the last weeks of her life, Pam had a serious infection that impaired her judgment, causing her at one point to attempt to cut her IV lines. Jennifer kept nearly constant vigil at Pam's side to ensure she remained safe and her every need was met.

38.    Pam passed away at home on March 1, 2014, surrounded by her children, Jennifer, and a hospice nurse.

39.    When Jennifer thinks about her marriage to Pam, and how to honor her memory, she wants to shout their love from the rooftops.  But only hours after Pam's death, the State refused to recognize their marriage on the final document memorializing Pam's existence – her death certificate.

40.    The day after Pam's death, Jennifer and Pam's 18-year-old son went to the funeral home to make arrangements and review the information to be submitted to the State for the death certificate.  The funeral home informed Jennifer that, under Georgia law, the only options she could choose for Pam's marital status were "never married," "widowed," or "divorced."  Jennifer burst into

13

tears, and Pam's son – who was proud of the couple's marriage – was stunned and upset.  When Jennifer received the death certificate from the State, it listed Pam as "never married."  Jennifer was listed only as an "informant" and "partner," and the space for Pam's spouse was left blank.  Defendant Deborah Aderhold signed the death certificate as the State Registrar.

41.     For Jennifer, this is a painful negation of her loving marriage to Pam and their unshakeable devotion to each other through to the last moments of Pam's life.  Jennifer's claim is simple and profound:  she wishes to have a death certificate that reflects her marriage to Pam, rather than one that erases their legal bond together as spouses.

**B.     Defendants**

42.     Defendant Deborah Aderhold is sued in her official capacity as State Registrar and Director of Vital Records.  As State Registrar, Ms. Aderhold is responsible for the State Office of Vital Records and vital records registration system.  This includes the registration, collection, preservation, amendment, and certification of vital records, including certificates of marriage, birth, and death.  Ms. Aderhold's statutory duties also include directing, supervising, and issuing instructions for administration and staff activities of the State Office of Vital Records, and promoting uniformity of policy and procedures throughout the State

14

in these matters.  Ms. Aderhold also is required to prescribe, furnish, and distribute forms relating to vital records, including, upon information and belief, forms that express and enforce the State's marriage bans for purposes of marriage, birth, and death certificates.  Ms. Aderhold and her designees are also authorized to determine whether amendments to a death certificate may be made, including the amendment Named Plaintiff Jennifer Sisson would request if Georgia law acknowledged her marriage to her recently-deceased spouse.  Ms. Aderhold must ensure compliance through all of these functions with relevant State laws, including those that exclude same-sex couples from marriage and from having lawful out-of-state marriages recognized.  She is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law at all times relevant to this Complaint.

43.     Defendant Brook Davidson is sued in her official capacity as Clerk of Gwinnett County Probate Court.  Ms. Davidson's statutory duties include issuing marriage licenses.  Ms. Davidson must ensure compliance through this function with relevant State laws, including those that exclude same-sex couples from marriage.  She is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law at all times relevant to this Complaint.

44.     The Honorable Judge Pinkie Toomer is sued in her official capacity as Judge of Fulton County Probate Court.  Judge Toomer's statutory duties include issuing marriage licenses.  Judge Toomer must ensure compliance through this function with relevant State laws, including those that exclude same-sex couples from marriage.  She is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law at all times relevant to this Complaint.

45.     Defendants, through their respective duties and obligations, are among those responsible for enforcing Georgia's marriage bans.  Each Defendant – and those state, county, and municipal employees subject to their direction, supervision, and control – intentionally performed, participated in, aided, or abetted in some manner the enforcement of the marriage bans; proximately caused harm to Plaintiffs in doing so; and will continue to injure Plaintiffs irreparably if not enjoined.

### III.   STATEMENT OF FACTS

46.     Plaintiffs are residents of Georgia who experience the same joys and challenges of family life as their heterosexual neighbors, co-workers, and other community members who may marry under Georgia law or whose lawful out-of-state marriages are recognized by Georgia.  Plaintiffs are productive, contributing citizens who support their families and nurture their children, but the State of

Georgia does not afford them the legal protections, dignity, and respect provided to other families through access to the status of marriage.  By excluding Plaintiffs from marriage and from recognition of their lawful out-of-state marriages, the State subjects Plaintiffs to legal vulnerability, unequal financial burdens, and related stress, while depriving them and their children of equal dignity and security.  The marriage bans send a purposeful message that the State views lesbians and gay men and their children as second-class members of society who do not deserve the same legal sanction, legal protection, respect, support, responsibilities, and obligations as different-sex spouses and their families.

### A.    Named Plaintiffs' Attempts To Marry And Lawful Marriages In Other Jurisdictions

47.    Named Plaintiffs Christopher Inniss and Shelton Stroman and Named Plaintiffs Michael Bishop and Johnny Shane Thomas want to marry in Georgia. They are legally qualified to marry under Georgia law, but for the fact that they are the same sex.  They are of sound mind and capable of consent.  They are over the age of 18.  They have no living spouse of a previous undissolved marriage.  They are not related to their prospective spouses within the prohibited degrees of blood or marriage.  They are willing to provide the information to receive a marriage license and to pay the required fee.  They are able and eager to assume the responsibilities of marriage.

17

48.     On April 17, 2014, Christopher Inniss and Shelton Stroman appeared in person at the Gwinnett County Probate Court to apply for a marriage license. An agent or employee of Defendant Brook Davidson refused their application because they are the same sex.

49.     On April 10, 2014, Michael Bishop and Johnny Shane Thomas appeared in person at the Fulton County Probate Court to apply for a marriage license.  On April 14, 2014, they received an order of the Probate Court of Fulton County denying their marriage license because they are the same sex, citing Art. I, Section IV, para. 1 of the Georgia Constitution and O.C.G.A. § 19-3-30(b)(1).

50.     Named Plaintiffs RayShawn Chandler and Avery Chandler were legally married in Connecticut on June 26, 2013.  The State of Georgia would recognize them as married but for the fact that they are the same sex.

51.     Named Plaintiff Jennifer Sisson and her late spouse Pamela Drenner were legally married in New York on February 14, 2013.   The State of Georgia would recognize Jennifer's marriage to Pam but for the fact they were the same sex.

**B.     The Plaintiff Class**

52.     Named Plaintiffs propose to represent a Class consisting of all Georgia residents who are unmarried same-sex couples and all Georgia residents

who have lawfully married a same-sex spouse in another jurisdiction (*see* Paragraph 76).

53.     This Class reflects the rich diversity of the State.  Class members come from all walks of life, and include, by way of example, people who risk their lives daily to serve as police officers; people who serve or have served the State and their country as members of the armed forces; doctors, nurses, social workers, attorneys, government officials and employees, accountants, artists, engineers, sales people, office workers, factory workers, small business owners, professors, students, fathers, mothers, grandfathers, grandmothers, stay-at-home parents, homemakers, retirees, and members of diverse faith communities.  Many Class members are raising children together.

54.     Because of the State's marriage bans, each Class member is either unable to marry a same-sex partner in Georgia or denied recognition of her or his lawful out-of-state marriage to a same-sex spouse.

### C.     The Marriage Bans

55.     In 1996, the Georgia legislature enacted O.C.G.A. § 19-3-3.1.  This statute – intended as a response to court decisions indicating that Hawaii might allow same-sex couples to marry – included sweeping language that prohibited marriage of same-sex couples; voided marriages from other jurisdictions; stripped

19

Georgia courts of jurisdiction to rule on rights arising from out-of-state marriages;

voided "contractual rights" arising from those marriages; and prohibited divorce in

Georgia of same-sex couples married outside the state.  O.C.G.A. § 19-3-3.1

provides:

> (a)   It is declared to be the public policy of this state to recognize the union only of man and woman.  Marriages between persons of the same sex are prohibited in this state.

> (b)   No marriage between persons of the same sex shall be recognized as entitled to the benefits of marriage.  Any marriage entered into by persons of the same sex pursuant to a marriage license issued by another state or foreign jurisdiction or otherwise shall be void in this state.  Any contractual rights granted by virtue of such license shall be unenforceable in the courts of this state and the courts of this state shall have no jurisdiction whatsoever under any circumstances to grant a divorce or separate maintenance with respect to such marriage or otherwise to consider or rule on any of the parties' respective rights arising as a result of or in connection with such marriage.

56.    In 2004, the State of Georgia went further to ensure that same-sex

couples could not obtain any State-recognized status by referring to the voters a

proposed constitutional amendment to expand the marriage ban and enshrine that

ban in the State's Constitution:

> (a)   This state shall recognize as marriage only the union of man and woman.  Marriages between persons of the same sex are prohibited in this state.

> (b)   No union between persons of the same sex shall be recognized by this state as entitled to the benefits of marriage.  This state shall not give effect to any public act, record, or judicial proceeding of any other

20

state or jurisdiction respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other state or jurisdiction.  The courts of this state shall have no jurisdiction to grant a divorce or separate maintenance with respect to any such relationship or otherwise to consider or rule on any of the parties' respective rights arising as a result of or in connection with such relationship.

57.     The voters ratified the amendment, codified as Georgia Constitution art. I, § IV, para. I, in November 2004.

**D.     Illustrative Harms**

58.     Barring same-sex couples from marriage or from recognition of their lawful out-of-state marriage disqualifies them from rights and responsibilities that different-sex couples rely on to secure their commitment to each other, and to safeguard their families.  By way of example, the marriage bans deny same-sex couples in Georgia:

(a)     The ability to celebrate a "marriage" through a state-approved ceremony, which symbolizes the binding together of two lives and two families, and creates relationships and memories that couples, families, and friends cherish for a lifetime.  O.C.G.A. § 19-3-1(3).

(b)     The ability to safeguard family resources under an array of laws that include, for example, the exemption from taxable income of the value of health insurance coverage that one spouse receives through the other's

employment and the homestead tax exemption for disabled veterans or their surviving spouse.  O.C.G.A. § 48-5-48.

(c)     The ability to make caretaking decisions and exercise other rights in times of death and disaster, including the ability to make medical decisions for an incapacitated spouse, O.C.G.A. § 31-9-2(a)(2); the ability to receive autopsy and crime scene photographs, O.C.G.A. § 45-16-27; the ability to consent to an autopsy, O.C.G.A. § 45-16-28; priority to control disposition of a deceased spouse's remains and to make funeral arrangements, O.C.G.A. § 31-21-7(b)(3); priority to make anatomical gifts of a decedent's body, O.C.G.A. § 44-5-147(a)(2); standing to bring suit for wrongful death of a spouse, O.C.G.A. § 51-4-2(a); and the ability to recover worker's compensation benefits for a spouse killed on the job, O.C.G.A. § 34-9-13(c).

(d)     The ability to support each other in end-of-life circumstances, such as being assured privacy for visits with a spouse in a nursing home and the right to share a room with a spouse if both reside in the same nursing home. O.C.G.A. § 31-8-114(3).

(e)     The right to inheritance under the laws of intestacy, O.C.G.A. § 53-2-1; the right to a year's support and maintenance for the surviving spouse and children, O.C.G.A. § 53-3-1(c); the ability to elect the year's support in lieu

of the will's provision for the spouse, O.C.G.A. § 53-3-3; preference for appointment as an administrator of the deceased spouse's estate, O.C.G.A. § 53-6-20; and various survivor benefits, including benefits for a spouse and children of law enforcement officers, firefighters, and other emergency personnel killed in the line of duty, O.C.G.A. § 45-9-85.

(f)     Benefits for families who have made some of the greatest sacrifices for our country, including a homestead tax exemption for surviving spouses of disabled military veterans, O.C.G.A. § 48-5-48; an honorary driver's license for the spouse of a veteran, O.C.G.A. § 40-5-36; license plates commemorating a spouse's military service, including gold star plates for a spouse killed in action, O.C.G.A. § 40-2-85.3; and the ability to be interred in the same plot in a veteran's cemetery, O.C.G.A. § 38-4-70.

(g)     The ability to secure legal recognition for parent-child bonds, including joint adoption by spouses and adoption of a spouse's child. O.C.G.A. § 19-8-3(c).

(h)     The ability to file married and/or joint tax returns for both federal and Georgia taxes.  On August 29, 2013, the Internal Revenue Service issued Rev. Rule 2013-17, which provides that same-sex spouses will be treated as married for federal tax purposes whether or not the couple lives in a state

23

that recognizes marriage between persons of the same sex. Under Rule 2013-17, same-sex spouses must now file federal income tax returns using a married filing separately or jointly status. Following the issuance of Rule 2013-17, however, the Georgia Department of Revenue announced that same-sex married couples must file Georgia taxes as if they were single. Under Georgia Department of Revenue Informational Bulletin IT-2013-10-25 (Oct. 25, 2013), a Georgia resident in a marriage with a person of the same sex whose federal income tax status is "married filing jointly" or "married filing separately" must complete a separate Georgia Form 500 for single filing status and recompute their federal Adjusted Gross Income and deductions, effectively requiring them to prepare dummy individual federal returns.

(i)      The right to take leave under the Family Medical Leave Act ("FMLA") to care for a same-sex spouse. Under the FMLA, 29 U.S.C. §§ 2601 *et seq*., employees are entitled to 12 weeks of unpaid leave in a 12-month period to care for a spouse with a serious medical condition, or 26 weeks to care for an eligible military service-member spouse with a serious injury or illness. Moreover, the spouses of service-members on covered active duty or who have been notified of an impending call or order to

covered active duty may take FMLA leave to address short-notice

deployment issues, for military events and ceremonies, to make or update

financial or legal arrangements, for counseling, and other exigencies caused

by a call to service, 29 C.F.R. § 825.126.  Because by regulation the

employee's state of residence determines whether a person is considered a

spouse under the FMLA, *see* 29 C.F.R. § 825.102, same-sex spouses

residing in Georgia are not considered spouses and would not be entitled to

FMLA leave.

(j)      A range of important responsibilities that, like rights, enhance the

dignity and integrity of the person.  For example, same-sex couples are

denied the ability to be made legally accountable to each other through

obligations of spousal support and child support, O.C.G.A. §§ 19-6-1, 19-6-

15; and, in the event of separation, are denied access to an orderly

dissolution process for terminating the relationship and assuring an equitable

division of assets and debts, O.C.G.A. §§ 19-5-1, 19-5-13.

(k)      Rights and responsibilities under more than 1,000 federal statutes and

regulations involving marriage, including laws pertaining to Social Security,

housing, taxes, criminal sanctions, copyright, and veterans' benefits.

Couples lawfully married in other jurisdictions and living in Georgia may

25

qualify for some federal benefits and protections, but may be denied others, such as veteran's spousal benefits and Social Security survivor benefits. Many of these deprivations drain family financial resources, causing harm not only to same-sex couples but also to their children.

59.    In addition to these tangible harms, the State's marriage bans deny Plaintiffs the unique social recognition that marriage conveys.  Without access to the familiar language and legal label of marriage, Plaintiffs are unable immediately or adequately to communicate to others the depth and permanence of their commitment, or to obtain respect for that commitment simply by invoking their married status.

60.    The inequities imposed on committed same-sex couples include harms specific to their children, who are equally deserving of the stability, permanence, and legitimacy enjoyed by children of different-sex spouses.  Civil marriage affords official sanctuary to the family unit, offering parents and children critical means to secure legal parent-child bonds and a familiar, public way of demonstrating those bonds to third parties.  By denying same-sex couples access to marriage, the State reinforces the view held by some that the family bonds that tie same-sex parents and their children are less consequential, enduring, and meaningful than those of different-sex parents and their children.  Same-sex

26

couples and their children must live with the vulnerability and stress inflicted by a lack of access to the same mechanisms for securing their legal relationships, and the ever-present possibility that others may question their familial relationship – in social, legal, educational, and medical settings and in moments of crisis – in a way that spouses can avoid by simple reference to being married.

61.    Children understand from an early age that marriage signifies an enduring family unit, and likewise understand that the State has deemed a class of families less worthy than others, undeserving of marriage, and not entitled to the same societal recognition and support as other families.  The State has no adequate interest to justify marking the children of same-sex couples, including the children of Named Plaintiffs, with a badge of inferiority that will invite disrespect in school, on the playground, and in every other sphere of their lives.

62.    The government is a powerful teacher of discrimination.  By decreeing that same-sex relationships should be ignored in Georgia and enforcing that decree, the State and Defendants instruct all persons who interact with same-sex couples, including those couples' own children, that their relationships are less worthy than others.  Bearing the imprimatur of the government, the State's marriage bans and Defendants' enforcement of them communicate a view that same-sex couples and their children are unfit for the dignity, respect, and stature

27

afforded to different-sex couples and their children.  This encourages others in workplaces, schools, businesses, and other arenas of life to follow the government's example in discriminating against same-sex couples – and, in turn, lesbians and gay men.

63.     Many private entities defer to the State's pronouncement of marital status in defining "family" for purposes of benefits, often resulting in the exclusion of same-sex couples and their children from safety nets such as private employer-provided health insurance for family members.

**E.     The Marriage Bans Pass No Level Of Scrutiny**

64.     There is no legitimate interest, let alone an important or compelling one, in excluding same-sex couples from the institution of marriage.

65.     Neither history nor tradition can justify the exclusion of same-sex couples from marriage.  Marriage has remained vital and enduring because of its resilience in response to a dynamic society, as society and the courts have cast off restrictions on, for example, interracial marriage and coverture.

66.     As the Supreme Court has made clear, the law cannot, directly or indirectly, give effect to private biases.  Liberty and equality, not moral disapproval, must be the guiding framework for a state's treatment of its citizens.

67.     Excluding same-sex couples from marriage does nothing to protect or enhance the rights of different-sex couples.  Different-sex spouses will continue to enjoy the same rights and status conferred by marriage, unimpaired by the acknowledgment that this freedom belongs equally to same-sex couples.

68.     Although the State has a valid interest in protecting the public fisc, it may not pursue that interest by making invidious distinctions between classes of its citizens without adequate justification.

69.     The State's interest in child welfare is harmed rather than furthered by excluding same-sex couples from marriage.  That exclusion injures same-sex couples' children without offering any conceivable benefit to other children.

70.     Barring same-sex couples from marriage does not affect which couples raise children together.  Same-sex couples in Georgia can and do bear children through reproductive technology that is available to different-sex couples, and also bring children into their families through foster care and adoption. Marriage has never been the sole province of couples who are or who may become parents.  Neither Georgia nor any other state has ever restricted marriage to those capable of or intending to procreate.

71.     There is no valid basis for the State to assert a preference for parenting by different-sex couples over same-sex couples.  Based on more than 30

years of research, the scientific community has reached a consensus that children raised by same-sex couples are as well-adjusted as children raised by different-sex couples. This consensus has been recognized by every major professional organization dedicated to children's health and welfare, including the American Academy of Pediatrics, the American Medical Association, the American Psychological Association, the National Association of Social Workers, and the Child Welfare League of America.

72.     Other courts have found, after trials involving expert testimony, that there is no rational basis for favoring parenting by heterosexual couples over lesbian and gay couples. *See*, *e.g.*, *DeBoer v. Snyder*, No. 12-CV-10285, 2014 WL 1100794, at *14 (E.D. Mich. Mar. 21, 2014) (finding that children's outcomes do not depend on the sex or sexual orientation of their parents); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 980 (N.D. Cal. 2010) (finding that the research supporting the conclusion that "[c]hildren raised by gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy, successful and well-adjusted" is "accepted beyond serious debate in the field of developmental psychology"), *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012), *vacated for lack of standing sub nom. Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013); *In re Adoption of Doe*, 2008 WL 5006172, at *20 (Fla. Cir. Ct.

Nov. 25, 2008) ("based on the robust nature of the evidence available in the field, this Court is satisfied that the issue is so far beyond dispute that it would be irrational to hold otherwise; the best interests of children are not preserved by prohibiting homosexual adoption"), *aff'd sub nom. Florida Dep't of Children & Families v. Adoption of X.X.G.*, 45 So.3d 79 (Fla. Dist. Ct. App. 2010); *Howard v. Child Welfare Agency Review Bd.*, Nos. 1999-9881, 2004 WL 3154530, at *9 and 2004 WL 3200916, at *3-4 (Ark. Cir. Ct. Dec. 29, 2004) (holding that "there was no rational relationship between the [exclusion of gay people from becoming foster parents] and the health, safety, and welfare of the foster children."), *aff'd sub nom. Dep't of Human Servs. v. Howard*, 238 S.W.3d 1 (Ark. 2006).

73.    Excluding same-sex couples from marriage harms their children by, among other things, branding their families as inferior and less deserving of respect, and encouraging private bias and discrimination.  Denying same-sex couples the dignity and status of marriage humiliates the children raised by those couples, and makes it more difficult for the children to understand the integrity and closeness of their own families and its concord with other families in their community.

74.    Excluding same-sex couples from marriage will not make the children of different-sex spouses more secure.  The children of different-sex spouses will

continue to enjoy the benefits that flow from their parents' marriages regardless of whether same-sex couples are permitted to marry.  The marriage bans have no conceivable effect on the choices different-sex couples make about such profound issues as whether to marry, whether to have children, and whether to raise their children in wedlock.

75.    The State's interest in the welfare of children parented by same-sex couples is as great as its interest in the welfare of any other children.  The family security that comes from the State's official recognition and support is no less important for same-sex parents and their children than it is for different-sex parents and their children.

## IV.    CLASS ACTION ALLEGATIONS

76.    Named Plaintiffs bring this action for themselves and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of all same-sex couples who are injured by the State's marriage bans.  The proposed Plaintiff Class consists of:

       a.    All Georgia residents who are unmarried same-sex couples; and

       b.    All Georgia residents who have lawfully married a same-sex spouse in another jurisdiction.

77.     The Class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).  Upon information and belief, there are thousands of Georgia residents in same-sex couples who would marry if Georgia law permitted them to do so or who lawfully married same-sex spouses in other jurisdictions or would do so if Georgia recognized those marriages.  The State's marriage bans, and Defendants' enforcement of them, prevent those couples from marrying or having their lawful marriage in another jurisdiction recognized by the State.

78.     There are questions of law and fact common to the members of the Class.  Fed. R. Civ. P. 23(a)(2).  These questions include, but are not limited to:

a.     Whether the State's marriage bans violate federal substantive due process guarantees, including the fundamental right to marry, and liberty interests in autonomy and family integrity and association;

b.     Whether the State's marriage bans violate guarantees of equal protection regardless of an individual's sexual orientation and sex in relation to the sex of his or her life partner; and

c.     The level of constitutional scrutiny applicable to governmental discrimination based on sexual orientation.

Defendants are expected to raise common defenses to those claims.

79.     The claims of Named Plaintiffs are typical of those of the Plaintiff Class because they all arise from the State's marriage bans and are based on the same theories of law.

80.     Named Plaintiffs are capable of fairly and adequately protecting the interests of the Plaintiff Class because they do not have any interests antagonistic to the Class.  Named Plaintiffs and the Plaintiff Class all seek to enjoin the State's marriage bans.  Moreover, Named Plaintiffs are represented by counsel experienced in civil rights litigation and class action litigation.

81.     This action may be maintained as a class action under Fed. R. Civ. P. 23(b)(1) because individual prosecution of separate actions would create a risk of inconsistent and varying adjudications, resulting in some Georgia same-sex couples having access to marriage or recognition of their valid marriage, and others not.  Individual prosecution of separate actions also could result in adjudications that, as a practical matter, would substantially impair the ability of other members to protect their interests.

82.     This class action also may proceed under Fed. R. Civ. P. 23(b)(2) because Defendants' enforcement of the marriage bans applies generally to the Class by precluding all Class Members from marrying or precluding recognition of

their lawful marriages in other jurisdictions.  The injunctive and declaratory relief sought is appropriate for the Class as a whole.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Deprivation of Due Process
### U.S. Const. Amend. XIV

83.    Plaintiffs incorporate by reference and reallege the preceding paragraphs of this Complaint here.

84.    Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking injunctive and declaratory relief.

85.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

86.    Georgia Constitution art. I, § IV, para. I, Official Code of Georgia Annotated §§ 19-3-3.1, 19-3-30, and all other sources of Georgia law that preclude marriage for same-sex couples or prevent recognition of their marriages violate the due process guarantee of the Fourteenth Amendment both facially and as applied to Plaintiffs.

87.     The right to marry the unique person of one's choice and to direct the course of one's life in this intimate realm without undue government restriction is one of the fundamental liberty interests protected for all by the Due Process Clause of the Fourteenth Amendment.  Defendants' enforcement of the marriage bans impermissibly infringes on Plaintiffs' choice of whom to marry and their ability to have their marriages recognized, interfering with a core, life-altering, and constitutionally protected choice.

88.     The Due Process Clause also protects choices central to privacy, personal dignity, and autonomy, including each individual's rights to family integrity and association.  Defendants' enforcement of the marriage bans impermissibly infringes Plaintiffs' intimate, personal, and private decisions about family life, and precludes Plaintiffs from obtaining full liberty, dignity, and security for themselves, their family, and their parent-child bonds.

89.     As the State Registrar and Director of Vital Records, Defendant Deborah Aderhold enforces the marriage bans by, among other things, prescribing, furnishing, and distributing forms that prohibit same-sex couples from marrying and forms that prohibit same-sex couples from having their lawful out-of-state marriages recognized on birth and death certificates.  These actions violate Plaintiffs' fundamental rights with respect to marriage and constitutional rights to

36

liberty, dignity, autonomy, family integrity, association, and due process under the Fourteenth Amendment to the United States Constitution.  This includes the rights of Plaintiffs who wish to marry and to have their existing marriages recognized, such as Named Plaintiffs RayShawn Chandler and Avery Chandler, who both want to be listed as parents on the birth certificates of their planned children, and Named Plaintiff Jennifer Sisson, who seeks an accurate death certificate for her departed spouse, Pamela Drenner, as well as of married and unmarried members of the Plaintiff Class.

90.    As Clerk of Gwinnett County Probate Court, Defendant Brook Davidson ensures compliance with the marriage bans by, for example, denying same-sex couples marriage licenses.  These actions violate the fundamental right to marry and the rights, protected under the Fourteenth Amendment to the United States Constitution, to liberty, dignity, autonomy, family integrity, association, and due process of Named Plaintiffs Christopher Inniss and Shelton Stroman, and the unmarried members of the Plaintiff Class.

91.    As the Judge of Fulton County Probate Court, the Honorable Judge Pinkie Toomer ensures compliance with the State's marriage bans by, for example, denying same-sex couples marriage licenses.  These actions violate the fundamental right to marry and the rights, protected under the Fourteenth

Amendment to the United States Constitution, to liberty, dignity, autonomy, family integrity, association, and due process of Named Plaintiffs Michael Bishop and Shane Thomas, and the unmarried members of the Plaintiff Class.

92.     Defendants cannot satisfy the Due Process Clause's decree that governmental interference with a fundamental right or liberty interest may be sustained only upon a showing that the burden is narrowly tailored to serve a compelling or important governmental interest, because the marriage bans are not even tailored to any legitimate interest.

**SECOND CLAIM FOR RELIEF**
**Deprivation of Equal Protection**
**U.S. Const. Amend. XIV**

93.     Plaintiffs incorporate by reference and reallege the preceding paragraphs of this Complaint here.

94.     Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief.

95.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

96.     As described throughout this Complaint, same-sex couples such as Plaintiffs are identical to different-sex couples in all characteristics relevant to marriage (*see, e.g.*, Paragraphs 11-14).

97.     Georgia Constitution art. I, § IV, para. I, Official Code of Georgia Annotated §§ 19-3-3.1, 19-3-30, and all other sources of Georgia law that preclude marriage for same-sex couples or prevent recognition of their marriages violate the equal protection guarantee of the Fourteenth Amendment both facially and as applied to Plaintiffs.  Defendants' conduct in enforcing these laws violates Plaintiffs' right to equal protection by discriminating impermissibly on the basis of sexual orientation and sex.  Moreover, by enshrining discrimination in the form of a constitutional amendment, Georgia Constitution art. I, § IV, para. I, deprives lesbian and gay Georgians of the equal protection of the laws by locking them out of the political process and making it uniquely more difficult to secure legislation on their behalf.

98.     As the State Registrar and Director of Vital Records, Defendant Deborah Aderhold enforces the marriage bans by, among other things, prescribing, furnishing, and distributing forms that prohibit same-sex couples from marrying, and forms that prohibit same-sex couples from having their lawful out-of-state marriages recognized on birth and death certificates.  These actions violate

39

Plaintiffs' constitutional rights to equal treatment, without regard to sexual orientation or sex, under the Fourteenth Amendment to the United States Constitution.  This includes the rights of Plaintiffs who wish to marry or have their existing marriages recognized, such as Named Plaintiffs RayShawn Chandler and Avery Chandler, who both want to be listed as parents on the birth certificates of their planned children, and Named Plaintiff Jennifer Sisson, who seeks an accurate death certificate for her departed spouse, Pamela Drenner, as well as of married and unmarried members of the Plaintiff Class.

99.    As Clerk of Gwinnett County Probate Court, Defendant Brook Davidson ensures compliance with the marriage bans by, for example, denying same-sex couples marriage licenses.  These actions violate the constitutional rights to equal treatment of Named Plaintiffs Christopher Inniss and Shelton Stroman, and the unmarried members of the Plaintiff Class.

100.   As the Judge of Fulton County Probate Court, the Honorable Judge Pinkie Toomer ensures compliance with the marriage bans by, for example, denying same-sex couples marriage licenses.  These actions violate the constitutional rights to equal treatment of Named Plaintiffs Michael Bishop and Shane Thomas, and the unmarried members of the Plaintiff Class.

101.   The State's marriage bans, and Defendants' actions to enforce them, deny same-sex couples equal dignity and respect, and deprive their families of a critical safety net of rights and responsibilities.  The marriage bans brand lesbians and gay men and their children as second-class citizens through government-imposed stigma and promote private bias and discrimination by instructing that same-sex relationships are less worthy than others.  The marriage bans reflect moral disapproval and antipathy toward lesbians and gay men.

102.   ***Discrimination Based on Sexual Orientation.***  The State's marriage bans target lesbian and gay Georgians as a class for exclusion from marriage and discriminate against Plaintiffs based on their sexual orientation, both facially and as applied.

103.   The exclusion of Plaintiffs from marriage based on their sexual orientation subjects Defendants' conduct to strict or at least heightened scrutiny. Defendants' conduct cannot withstand this scrutiny because the exclusion does not serve any legitimate governmental interests, let alone any important or compelling interests, and does not serve any interests in an adequately tailored manner.

104.   Lesbians and gay men have suffered a long and painful history of discrimination in Georgia and across the United States.

41

105.   Sexual orientation bears no relation to an individual's ability to perform in or contribute to society.

106.   Sexual orientation is a core, defining trait that is so fundamental to one's identity and conscience that a person may not legitimately be required to abandon it (even if that were possible) as a condition of equal treatment.

107.   Sexual orientation generally is fixed at an early age and highly resistant to change through intervention.  No credible evidence supports the notion that interventions are effective or safe; indeed, they often are harmful and damaging.  No mainstream mental health professional organization approves interventions intended to change sexual orientation, and almost all of them have adopted policy statements cautioning professionals and the public against these treatments.

108.   Prejudice against lesbians and gay men continues to curtail the operation of political processes that might ordinarily be relied upon to protect minorities.  Lesbians and gay men have fewer civil rights protections at the state and federal level than racial minorities and women had when race- and sex-based classifications were declared to be suspect and quasi-suspect, respectively.

109.   Lesbians and gay men lack express statutory protection against discrimination in employment, public accommodations, and housing at the federal

42

level and in more than half the states, including Georgia.  They are systematically

under-represented in federal, state, and local democratic bodies.  They have been

denied the right to marry through 30 state constitutional amendments and currently

are not permitted to marry in 33 states.  They have been targeted across the nation

through the voter initiative process more than any other group.

110.  ***Discrimination Based on Sex***.  The State's marriage bans

discriminate against Plaintiffs on the basis of sex, both facially and as applied,

barring Plaintiffs from marriage or from recognition of their lawful marriages

solely because each Plaintiff wants to be married to or married a spouse of the

same sex.  The sex-based restriction is plain on the face of the State's marriage

bans, which restrict marriage to a "man and woman" and prohibit marriage or

recognition of a marriage from another jurisdiction between "persons of the same

sex."  Ga. Const. art. I, § IV, para. I; O.C.G.A. §§ 19-3-3.1, 19-3-30.

111.  Because of these sex-based classifications, Georgia prohibits Named

Plaintiff Christopher Inniss from marrying his devoted life partner because he is a

man and not a woman; if Christopher were a woman, he could marry Shelton.

Named Plaintiff Avery Chandler is precluded from having her marriage to

RayShawn recognized as valid because she is a woman and not a man; if Avery

were a man, Georgia would recognize her lawful marriage to RayShawn.  Named

43

Plaintiff Jennifer Sisson is precluded from having her marriage to her deceased spouse, Pamela Drenner, recognized as valid because she is a woman and not a man; if Jennifer were a man, Georgia would recognize her lawful marriage to Pam.

112.   The State's marriage bans also serve the impermissible purpose of enforcing and perpetuating sex stereotypes by excluding Plaintiffs from marriage or from being recognized as lawfully married because Plaintiffs have failed to conform to sex-based stereotypes that men should marry women, and women should marry men.

113.   Because there are no longer legal distinctions between the duties of husbands and wives, there is no basis for the sex-based eligibility requirements for marriage.

114.   The exclusion of Plaintiffs from marriage based on their sex and the enforcement of gender-based stereotypes cannot survive the heightened scrutiny required for sex-based classifications in laws.

115.   ***Discrimination with Respect to Fundamental Rights and Liberty Interests Secured by the Due Process Clause***.  The State's marriage bans discriminate against Plaintiffs based on sexual orientation and sex with respect to the exercise of the fundamental right to marry and their liberty interests in dignity, autonomy, and family integrity and association.  Differential treatment of

44

Plaintiffs' exercise of fundamental rights and liberty interests based on their sexual orientation and sex subjects Defendants' conduct to strict or at least heightened scrutiny, which Defendants' conduct cannot withstand.

## DECLARATORY AND INJUNCTIVE RELIEF

### 28 U.S.C. §§ 2201 and 2202;
### Federal Rules of Civil Procedure, Rules 57 and 65

116.   Plaintiffs incorporate by reference and reallege the preceding paragraphs of this Complaint here.

117.   This case presents an actual controversy because Defendants' present and ongoing denial of due process and equal protection subjects Plaintiffs to serious and immediate harms, warranting the issuance of a declaratory judgment.

118.   Named Plaintiffs seek injunctive relief on behalf of themselves and the Plaintiff Class to protect their constitutional rights and avoid the injuries described above.  A decision enjoining Defendants would redress and prevent irreparable injuries to Plaintiffs, for which Plaintiffs have no adequate remedy at law or in equity.

119.   The State will incur little to no burden in allowing same-sex couples to marry and in recognizing the lawful marriages of same-sex couples from other jurisdictions on the same terms as different-sex couples, while the hardship to Plaintiffs of being denied due process and equal protection is severe, subjecting

45

them to an irreparable denial of their constitutional rights.  The balance of hardships thus tips strongly in favor of Plaintiffs.

## VI.   PRAYER FOR RELIEF

Plaintiffs request that this Court enter judgment:

A.     Declaring that the suit is maintainable as a class action pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(1) and (2);

B.     Declaring that the provisions of and enforcement by Defendants of Georgia Constitution art. I, § IV, para. I, Official Code of Georgia Annotated §§ 19-3-3.1, 19-3-30, and all other sources of Georgia law that prohibit same-sex couples from marrying or refuse recognition to lawful out-of-state marriages of same-sex spouses violate Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution;

C.     Permanently enjoining enforcement by Defendants of Georgia Constitution art. I, § IV, para. I, Official Code of Georgia Annotated §§ 19-3-3.1, 19-3-30, and all other sources of Georgia law that exclude same-sex couples from marriage or that refuse recognition to lawful out-of-state marriages of same-sex couples;

D.     Requiring Defendants in their official capacities to permit issuance of marriage licenses to same-sex couples and to recognize lawful out-of-state

marriages of same-sex couples, subject to the same restrictions and limitations applicable to different-sex couples;

     E.    Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

     F.    Granting such other and further relief as the Court deems just and proper.

     G.    The requested declaratory and injunctive relief is sought against each Defendant; each Defendant's officers, employees, and agents; and all persons acting in concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

Respectfully submitted this 22nd day of April, 2014,

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.

/s/ *Tara L. Borelli*
Tara L. Borelli (Bar No. 265084)
Gregory R. Nevins (Bar No. 539529)
Elizabeth L. Littrell (Bar No. 454949)
730 Peachtree Street, NE, Suite 1070
Atlanta, Georgia 30308
Phone: (404) 897-1880
Fax: (404) 897-1884
tborelli@lambdalegal.org
gnevins@lambdalegal.org
blittrell@lambdalegal.org

BRYAN CAVE LLP
William V. Custer (Bar No. 202910)
Jennifer D. Odom (Bar No. 549717)
Jennifer B. Dempsey (Bar No. 217536)
Luke A. Lantta (Bar No. 141407)
1201 W. Peachtree Street, N.W.
Fourteenth Floor
Atlanta, GA  30309
Phone:  (404) 572-6600
Fax:  (404) 572-6999
Bill.Custer@bryancave.com
Jennifer.Odom@bryancave.com
Jennifer.Dempsey@bryancave.com
Luke.Lantta@bryancave.com

47

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
Susan L. Sommer*
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
Fax: (212) 809-0055
ssommer@lambdalegal.org

BRYAN CAVE LLP
Douglas E. Winter*
1155 F. Street, NW, Suite 700
Washington, DC 20004
Phone: (202) 508-6000
Fax: (202) 220-7372
dewinter@bryancave.com

WHITE & CASE LLP
David P. Draigh*
Southeast Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Phone: (305) 995-5293
Fax: (305) 358-5744
ddraigh@whitecase.com

*Pro hac vice applications forthcoming*

Counsel for Plaintiffs

**LOCAL RULE 7.1(D) CERTIFICATION OF COMPLIANCE**

I certify that this pleading has been prepared with Times New Roman font,

14 point, as approved by the Court in L.R. 5.1(C), N.D. Ga.

Respectfully submitted, this 22nd day of April 2014.

/s/ Tara L. Borelli
Tara L. Borelli (Bar No. 265084)
tborelli@lambdalegal.org

48