IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHRISTOPHER INNISS, et al.,

          *Plaintiffs*,

      v.

DEBORAH ADERHOLD, et al.,

          *Defendants*.

Civil Action Number
1:14-CV-01180-WSD

# PLAINTIFFS' OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS
### THE AMENDED COMPLAINT

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
Tara L. Borelli (Bar No. 265084)
Gregory R. Nevins (Bar No. 539529)
Elizabeth L. Littrell (Bar No. 454949)
730 Peachtree Street, NE, Suite 1070
Atlanta, Georgia 30308

Susan L. Sommer (*Pro Hac Vice*)
120 Wall Street, 19th Floor
New York, NY 10005

BRYAN CAVE LLP
William V. Custer (Bar No. 202910)
Jennifer D. Odom (Bar No. 549717)
Jennifer B. Dempsey (Bar No. 217536)
Luke A. Lantta (Bar No. 141407)
1201 W. Peachtree Street, N.W., 14th Fl.
Atlanta, GA  30309

Douglas E. Winter (*Pro Hac Vice*)
1155 F. Street, NW, Suite 700
Washington, DC 20004

WHITE & CASE LLP
David P. Draigh (*Pro Hac Vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131-2352

# TABLE OF CONTENTS

STATEMENT OF FACTS ......................................................................... 5

STANDARD OF REVIEW ......................................................................8

ARGUMENT .........................................................................................9

I.     This Court Has Subject Matter Jurisdiction Over the Substantial Federal
       Questions Presented....................................................................12

       (A)    The Amended Complaint Presents Facts and Issues That Transcend
              Those Presented in *Baker v. Nelson* ...................................................13

       (B)    Doctrinal Developments Supersede *Baker*.........................................15

II.    The Amended Complaint States Claims for Violations of Due Process and
       Equal Protection.........................................................................20

       (A)    The Amended Complaint States a Due Process Claim .......................21

       (B)    The Amended Complaint States an Equal Protection Claim .............30

CONCLUSION ....................................................................................38

6377477.1

"The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts…. [Our] fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).

Plaintiffs Christopher Inniss and Shelton Stroman, RayShawn and Avery Chandler, Michael Bishop and Johnny Shane Thomas, Jennifer Sisson, and Elizabeth and Krista Wurz seek, for themselves and for their children, to vindicate fundamental rights guaranteed by the Fourteenth Amendment to the Constitution and denied them by the State of Georgia.

Defendants Deborah Aderhold and Monica Fenton, as public officers of the State of Georgia (collectively, "the State"), move to dismiss the Amended Complaint (ECF-37) under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (*see* ECF-29-1 and 42).[1]  The State seeks to perpetuate both its exclusion of couples of the same sex from the freedom to marry and its refusal to recognize

---

[1]     Aderhold filed a Motion to Dismiss on July 21, 2014 (ECF-29-1).  Plaintiffs filed their Amended Complaint, which added the Wurz Plaintiffs and Defendant Fenton on August 4, 2014 (ECF-37).  Aderhold and Fenton filed their Motion to Dismiss the Amended Complaint on August 18, 2014 (ECF-42).  That Motion adopted and incorporated the arguments of the Aderhold Motion.

lawful marriages entered in other jurisdictions.  *See* O.C.G.A. §19-3-3.1; Ga. Const. Art. I, Sec. IV, Para. I (collectively, the "Marriage Bans").

The Motion concedes that the "love that Plaintiffs articulate for their partners and their children is clear, as are their contributions to our society" (ECF-29-1 at 8).  The State effectively acknowledges that Plaintiffs and their children, although otherwise "equal," have been condemned by the State's actions to membership in an inferior tier of citizenry.  Stripped of rhetoric, the State's Motion enunciates no interest for this condemnation other than moral disapproval of an individual's choice to commit her or his life to a person of the same sex.  And at the same time, the State disrespects other states' decisions to allow couples of the same sex to marry.

Since the Supreme Court's decision in *United States v. Windsor*, 133 S. Ct. 2675 (2013), four U.S. Courts of Appeal and federal district courts in 16 states – Colorado, Florida, Idaho, Illinois, Indiana, Kentucky, Michigan, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah, Virginia, and Wisconsin – have held that similar restrictions on marriage for couples of the same sex violate the Fourteenth Amendment.[2]  Even though these courts found consistently that

---

[2]     *See Baskin v. Bogan*, Nos. 14-2386 to 14-2388, 14-2526 (7th Cir. Sept. 4, 2014); *Bostic v. Schaefer*, 2014 U.S. App. LEXIS 14298 (4th Cir. 2014); *Baldwin v. Smith*, 2014 U.S. App. LEXIS 13733 (10th Cir. 2014); *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014); *Burns v. Hickenlooper*, 2014 U.S. Dist. LEXIS 100894 (D. Colo. 2014); *Brenner v. Scott*, 2014 U.S. Dist. LEXIS 116684 (N.D. Fla.

plaintiffs should prevail on the merits, the State argues that the Georgia Plaintiffs should not be allowed even to proceed to the merits.  The Motion to Dismiss fails because:

    (1)    The Amended Complaint presents substantial federal questions of whether the State's Marriage Bans violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

    (2)    The 42-year-old summary dismissal in *Baker v. Nelson*, 409 U.S. 810 (1972) (*mem.*), does not divest this Court of jurisdiction given that:

---

2014); *Love v. Beshear*, 2014 U.S. Dist. LEXIS 89119 (W.D. Ky. 2014); *Kitchen v. Herbert*, 961 F. Supp. 2d 1181 (D. Utah 2013), *aff'd,* 755 F.3d 1193 (10th Cir. 2014); *Baskin v. Bogan*, 983 F. Supp. 2d 1021 (S.D. Ind. 2014), *aff'd*, *Baskin*, Nos. 14-2386 (7th Cir. 2014); *Wolf v. Walker*, 2014 U.S. Dist. LEXIS 77125 (W.D. Wis. 2014), *aff'd*, *Baskin*, Nos. 14-2386 (7th Cir. 2014); *Whitewood v. Wolf*, 992 F. Supp. 2d 410 (M.D. Pa. 2014); *Geiger v. Kitzhaber*, 2014 U.S. Dist. LEXIS 68171 (D. Or. 2014); *Latta v. Otter*, 2014 U.S. Dist. LEXIS 66417 (D. Idaho 2014); *Henry v. Himes*, 2014 U.S. Dist. LEXIS 51211 (S.D. Ohio 2014); *Lee v. Orr*, 2014 U.S. Dist. LEXIS 21620 (N.D. Ill. 2014); *DeBoer v. Snyder*, 973 F. Supp. 2d 757 (E.D. Mich. 2014); *Tanco v. Haslam*, 2014 U.S. Dist. LEXIS 33463 (M.D. Tenn. 2014); *De Leon v. Perry*, 975 F. Supp. 2d 632 (W.D. Tex. 2014); *Bostic v. Rainey*, 970 F. Supp. 2d 456 (E.D. Va. 2014); *Bourke v. Beshear*, 2014 U.S. Dist. LEXIS 17457 (W.D. Ky. 2014); *Bishop v. U.S. ex rel. Holder*, 962 F. Supp. 2d 1252 (N.D. Okla.), *aff'd sub nom. Baldwin v. Smith*, 2014 U.S. App. LEXIS 13733 (10th Cir. 2014); *Obergefell v. Wymyslo*, 962 F. Supp. 2d 968 (S.D. Ohio 2013); *Gray v. Orr*, 2013 U.S. Dist. LEXIS 171473 (N.D. Ill. 2013).  State courts have also held that similar marriage bans violate the Fourteenth Amendment.  *See, e.g.*, *Shaw v. Shaw*, 2014 Fla. App. LEXIS 13262 (Fla. App. 2014); *In re Marriage of H. Brassner*, 21 Fla. L. Weekly Supp. 920a (Fla. Cir. 2014); *Pareto v. Ruvin*, 21 Fla. L. Weekly Supp. 899a (Fla. Cir. 2014); *Huntsman v. Heavilin*, 21 Fla. L. Weekly Supp. 916a (Fla. Cir. 2014); *Brinkman v. Long*, 2014 WL 3408024 (Colo. Dist. 2014); *Wright v. State*, 2014 WL 1908815 (Ark. Cir. 2014); *Garden State Equality v. Dow*, 82 A.3d 336 (N.J. Super. 2013).

(a)    District courts should "allow jurisdictional dismissals only in those cases where the federal claim is clearly immaterial or insubstantial." *Garcia v. Copenhaver, Bell & Assoc.*, 104 F.3d 1256, 1261 (11th Cir. 1997) (citation omitted).

(b)    The Amended Complaint presents material facts and issues not presented in *Baker*, including substantial federal questions (i) whether one state may refuse to recognize – and effectively nullify – marriages lawfully entered in another state; and (ii) whether a state may refuse to allow or to recognize marriages between persons of the same sex who are parenting children together.

(c)    As five U.S. Court of Appeals decisions have held, doctrinal developments in Supreme Court jurisprudence leave *Baker* without precedential effect.

(3)    The Amended Complaint states claims for relief by alleging facts plausibly showing that Defendants, acting under color of law, have deprived Plaintiffs of constitutional rights of liberty and equality. Read, as required, in the light most favorable to Plaintiffs, the Amended Complaint alleges facts showing the Marriage Bans do not

further even a legitimate and rational, much less compelling, State

interest.

## STATEMENT OF FACTS

**The Marriage Bans.**  The Georgia legislature passed O.C.G.A. §19-3-3.1,

*et seq.*, titled the Defense of Marriage Act, in 1996, the same year the U.S.

Congress enacted its Defense of Marriage Act ("DOMA").  Both statutes were

responses to a Hawai'i Supreme Court decision that denying marriage to same-sex

couples constitutes discrimination based on sex.  *See Baehr v. Lewin*, 852 P.2d 44

(Haw. 1993).  Georgia added the Defense of Marriage Amendment to its

Constitution in 2004 after the Massachusetts Supreme Judicial Court held that a

prohibition on marriages by same-sex couples violated "the basic premises of

individual liberty and equality" protected by the state constitution.  *See Goodridge*

*v. Dept. of Public Health*, 798 N.E.2d 941 (Mass. 2003).

**The Impact of the Marriage Bans.**  The State acknowledges that:

- Plaintiffs Christopher Inniss and Shelton Stroman are a male couple who

  live in Snellville, Georgia, with their son, J.S.I.; and Christopher and Shelton

  "would like to enter into a same-sex marriage in order to affirm their

  relationship with each other and J.S.I. and to prevent societal disapproval

  that J.S.I. or they might face" (ECF-29-1 at 6; ECF-37 ¶¶ 20, 21, 23-25).

5

- Plaintiffs RayShawn and Avery Chandler are a female couple who live in Jonesboro, Georgia; they both served as Atlanta police officers; Avery is a U.S. Army reservist currently deployed to Kuwait; they married in Connecticut in June 2013; they intend to have children and both wish to be recognized as parents on the birth certificates; and they would like the security of automatically qualifying for survivor benefits if either of them should die in the line of duty (ECF-29-1 at 6-7; ECF-37 ¶¶ 26, 28-30).

- Plaintiffs Michael Bishop and Johnny Shane Thomas, a male couple, live in Atlanta, Georgia; they have a five-year-old son, T.A.B., and a three-year-old daughter, M.G.B.; and they "want to marry to express their devotion to each other and to obtain the dignity and legitimacy of marriage for T.A.B. and M.G.B" (ECF-29-1 at 6-7; ECF-37 ¶¶ 31-33).

- Plaintiff Jennifer Sisson lawfully married Pamela Drenner in New York in 2013; Pamela died from ovarian cancer in 2014; and Jennifer wishes to have a Georgia death certificate that acknowledges her as Pamela's surviving spouse (ECF-29-1 at 7-8; ECF-37 ¶¶ 42-43, 48-49).

Plaintiffs also include Elizabeth and Krista Wurz, a female couple who live in Brunswick, Georgia. They married in New Hampshire in 2010. They have seven children, including five placed with them through the Georgia foster care system, and they want to ensure through adoption that *both* are the parents of *each*

6

of those children.  In addition, Elizabeth works for the State and needs access to employer-provided spousal and dependent health insurance for Krista and several of the children (ECF-37 ¶¶34-41).

Although the "State values Plaintiffs as its citizens, and readily acknowledges its responsibility to ensure that they, too, enjoy due process and equal protection under law" (ECF-29-1 at 8), the State does not dispute – and, indeed, defends – that Georgia law prevents Plaintiffs from marrying in Georgia; refuses to recognize Plaintiffs' lawful out-of-state marriages; refuses to allow Plaintiffs jointly to adopt the children they are raising; prevents Plaintiffs from automatic entitlement to spousal and survivor benefits; and refuses to recognize Plaintiffs as spouses on death certificates (ECF-29-1 *generally*; ECF-37 ¶¶68-69).

The State also does not dispute that it provides those rights to heterosexual couples, but denies those rights to Plaintiffs solely because they are lesbians and gay men in relationships with partners of the same sex (ECF-29-1 at 30, 35; ECF-37 ¶¶50-54, 99-102, 109-14, 122-23).

Although the State would justify its conduct by resorting to "facts" outside the Amended Complaint such as its proposition that heterosexual marriages are more "child-centric" (*e.g.*, ECF-29-1 at 5-6), the Motion tests the allegations of the Amended Complaint.  As shown below, those allegations are sufficient to frame substantial federal questions and state 42 U.S.C. § 1983 claims for violation of due

process and equal protection.  Those allegations also show the State's lack of a

legitimate interest in, or even rational basis for, excluding couples of the same sex

from the fundamental right of marriage and failing to recognize unions of same-sex

couples solemnized in other states (ECF-37 ¶¶74-85).

### STANDARD OF REVIEW

**Rule 12(b)(1).**  "[I]t is extremely difficult to dismiss a claim for lack of

subject matter jurisdiction." *Garcia*, 104 F.3d at 1260.  The State does not contest

Plaintiffs' standing to sue.  Plaintiffs plead violations of 42 U.S.C. § 1983, which

present federal questions that confer subject matter jurisdiction. *See Grable &*

*Sons Metal Prods., Inc. v. Darue Eng'g*, 545 U.S. 308, 312 (2005).  The State's

argument that the Amended Complaint presents "the precise issues presented" in

*Baker v. Nelson* (ECF-29-1 at 11-12) is properly tested under Rule 12(b)(6).

Even if Rule 12(b)(1) applied, the State's *Baker* argument would be either a

"facial attack," limiting review to whether Plaintiffs' allegations, taken as true,

show a basis for subject matter jurisdiction, *Lawrence v. Dunbar*, 919 F.2d 1525,

1529 (11th Cir.1990), or a  "factual attack" implicating the merits, in which case

"[t]he proper course of action … is to find that jurisdiction exists and deal with the

objection as a direct attack on the merits...," *Garcia*, 104 F.3d at 1261.

**Rule 12(b)(6).**  A Rule 12(b)(6) motion does not test whether plaintiff "will

ultimately prevail," *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011), but whether

the complaint alleges "sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  The court "accept[s] as true the facts as set forth in the complaint and draw[s] all reasonable inferences in the plaintiff's favor."  *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010).

## <u>ARGUMENT</u>

The State urges this Court to ignore *Marbury v. Madison*, 5 U.S. 137 (1803), and defer to the "people of Georgia" who imposed the Marriage Bans in the first place (ECF-29-1 at 2-3).  The argument is as familiar as it is futile.

"[T]he courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority…."  *Federalist* No. 78.  "Minorities trampled on by the democratic process have recourse to the courts; the recourse is called constitutional law."  *Baskin*, Nos. 14-2386, at *37; *see also Bostic*, 2014 U.S. App. LEXIS 14298, at *50-53.

Our courts did not wait for the democratic process to undo racial segregation.  Our courts did not abandon the equal rights of women to politicians

9

or polls.  Our courts intervened to eliminate state bans on inter-racial marriage.
And the Supreme Court rejected the State's argument for deference when
invalidating DOMA in *Windsor*.  *See Brief of Respondent The Bipartisan Legal
Advisory Group of the U.S. House of Representatives* ("BLAG Brief"), 2013 U.S.
S. Ct. Briefs LEXIS 280, at *20 (arguing that laws like DOMA are "wisely left to
Congress and the democratic process").  In the wake of *Windsor*, courts around the
nation have not hesitated to rule that state bans on marriage between persons of the
same sex are an affront to constitutional ideals of liberty and equality.

The State argues – like Virginia more than fifty years ago in defending a
marriage ban that now would seem absurd were it not so offensive – that its ability
to set certain marriage eligibility criteria, such as age and blood test requirements,
excuses its abridgement of fundamental rights and explicit classification of a
minority group as second-tier citizens (ECF-29-1 at 17-18; *compare Loving v.
Virginia*, 1966 U.S. S. Ct. Briefs LEXIS 5, at *21-22 ("A state has power to
prescribe by law the age at which persons may enter into marriage, the procedure
essential to constitute a valid marriage, the duties and obligations which it creates,
and its effects upon the property rights of both parties.... *And within the range of
permissible adoption of policies deemed to be promotive of the welfare of society
as well as the individual members thereof, a state is empowered to forbid
marriages between persons of African descent and persons of other races or*

10

*descents. Such a statute does not contravene the Fourteenth Amendment.*")
(quotation omitted)).

But states are not, as the State contends, unfettered "laboratories of
democracy" that can regulate marriage "without interference by the federal
government" (ECF-29-1 at 17-18).  As the Supreme Court reaffirmed this term:
"States are laboratories for experimentation, but those experiments may not deny
the basic dignity the Constitution protects." *Hall v. Florida*, 134 S. Ct. 1986, 2001
(2014).  The Constitution "undoubtedly imposes constraints on the State's power
to control the selection of one's spouse." *Roberts v. U.S. Jaycees*, 468 U.S. 609,
620 (1984).  "State laws defining and regulating marriage … must respect the
constitutional rights of persons." *Windsor*, 133 S. Ct. at 2691; *see Loving v.
Virginia*, 388 U.S. 1, 7 (1967).

Despite praising Plaintiffs' "love … for their partners and their children" and
"their contributions to our society" (ECF-29-1 at 8), the State refuses to
acknowledge that, as long as its Marriage Bans remain in force, ordinary people
suffer.  People like Jennifer Sisson, whose lawful marriage in New York goes
unrecognized on her spouse's death certificate.  People like Avery and RayShawn
Chandler, who have served as Atlanta police officers but, though lawfully married
in Connecticut, would not automatically qualify for survivor benefits if one died in
the line of duty.  People like Christopher Inniss and Shelton Stroman, and Michael

11

Bishop and Johnny Shane Thomas, who have been denied marriage licenses; and Elizabeth and Krista Wurz, who were lawfully married in New Hampshire – three couples who are parenting and raising ten children under a State regime that creates a "stigma"; "humiliates" their children; and "instructs … all persons with whom [they] interact, including their own children, that their marriage is less worthy than the marriages of others." *Windsor*, 133 S. Ct. at 2693-94, 2696.

Our democracy functions and prevails because we promise liberty and equality for all.  Our judiciary exists to enforce that promise.  Plaintiffs turn to this Court to vindicate their families' rights to liberty and equality.

## I.     THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THE SUBSTANTIAL FEDERAL QUESTIONS PRESENTED

The State claims that the Supreme Court's 42-year-old summary dismissal in *Baker* deprives this Court of subject matter jurisdiction and bars the courthouse door to judicial review of the Marriage Bans (ECF-29-1 at 9-19).

At the time of *Baker*, 28 U.S.C. § 1257 required the Supreme Court to accept appeals of state high court cases involving constitutional challenges to state laws.  *Baker* was an appeal from a Minnesota Supreme Court decision holding that the state's refusal to allow partners of the same sex to marry did not violate due process or equal protection rights.  The Supreme Court summarily dismissed the appeal in a one-sentence order "for want of a substantial federal question."  409 U.S. at 810.

12

A summary dismissal lacks "the same precedential value … as does an opinion of [the Supreme] Court after briefing and oral argument on the merits." *Washington v. Conf. Bands & Tribes*, 439 U.S. 463, 476 n.20 (1979).  It merely "prevent[s] lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided" on "the particular facts involved." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).  And a summary dismissal loses this limited binding force when the Supreme Court's "doctrinal developments indicate otherwise," whether or not the Court explicitly overrules the case. *Hicks v. Miranda*, 422 U.S. 332, 343-45 (1975) (quotation omitted).

*Baker* does not control for two independent reasons:  The Amended Complaint presents facts and issues different from those "presented and necessarily decided" in *Baker*; and, as four U.S. Courts of Appeal have held, "doctrinal developments" in Supreme Court jurisprudence vitiate *Baker*'s already limited precedential value.

### (A)   The Amended Complaint Presents Facts and Issues That Transcend Those Presented In *Baker v. Nelson*

Although the State represents that *Baker* involved "claims indistinguishable from those here" (ECF-29-1 at 10), the Amended Complaint alleges facts and issues that transcend the "precise issues presented and necessarily decided" on "the particular facts involved" in *Baker*.  *Mandel*, 432 U.S. at 176.

13

*Baker* concerned a discrete *intra*state issue:  Whether the State of Minnesota could, consistent with then-existing interpretations of liberty and equality, deny a marriage license to persons of the same sex.  Although this lawsuit presents that issue, the Amended Complaint raises at least two other substantial issues.

*First*, unlike *Baker*, this lawsuit includes Plaintiffs who are lawfully married, and thus presents an issue with *inter*state consequences and implications:  Whether the State of Georgia can, consistent with constitutional principles, refuse to recognize in any way – and effectively void – marriages lawfully entered in other states (*see* ECF-37 ¶¶28, 35, 42).  This substantial federal question was not presented or decided in *Baker*.  And the State unwittingly concedes this by trying to distinguish *Windsor* as confined to its holding that "no legitimate purpose overcomes the purpose and effect to disparage and to injure [married same-sex couples] whom the State, by its marriage law, sought to protect in personhood and dignity" (ECF-29-1 at 14, *quoting Windsor*, 133 S. Ct. at 2696).

*Second*, the Amended Complaint, unlike *Baker*, raises issues about the State's oppression of parents and children:  Whether the State of Georgia can, consistent with constitutional principles, deny *parents* the ability to marry, or refuse to recognize their lawful marriages, on the basis of their sexual orientation and sex (*see* ECF-37 ¶¶60-62).  "[T]hese cases are … at a deeper level … about the welfare of American children."  *Baskin*, Nos. 14-2386, at *2.  The substantiality of

this federal question is underscored by the Supreme Court's observation that failing to recognize lawful marriages between couples of the same sex not only "demeans the couple" but also "humiliates" their children, *Windsor*, 133 S. Ct. at 2693-94, and by its repeated intervention to enforce constitutional rights affecting parent-child relationships and the status of children. *See, e.g.*, *Palmore v. Sidoti*, 466 U.S. 429, 434 (1984); *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982); *Moore v. City of E. Cleveland*, 431 U.S. 494, 510-12 (1977); *Stanley v. Illinois*, 405 U.S. 645, 658 (1972); *Levy v. Louisiana*, 391 U.S. 68, 71-72 (1968).

**(B)    Doctrinal Developments Supersede *Baker***

Even if the Amended Complaint did present the identical facts and issues presented in *Baker*, the Supreme Court has instructed that summary dismissals are not binding "when doctrinal developments indicate otherwise." *Hicks*, 422 U.S. at 343-45 (quotation omitted).  As the Eleventh Circuit has explained:

> Doctrinal developments need not take the form of an outright reversal of the earlier case.  The Supreme Court may indicate its willingness to reverse or reconsider a prior opinion with such clarity that a lower court may properly refuse to follow what appears to be binding precedent.... Even less clear-cut expressions by the Supreme Court can erode an earlier summary disposition because summary actions by the Court do not carry the full precedential weight of a decision announced in a written opinion after consideration of briefs and oral argument…. The Court could suggest that a legal issue once thought to be settled by a summary action should now be treated as an open question, and it could do so without directly mentioning the earlier case.  At that point, lower courts could appropriately reach their own conclusions on the merits of the issue.

*Hardwick v. Bowers*, 760 F.2d 1202, 1209 (11th Cir. 1985) (citations omitted),

*rev'd on other grounds*, *Bowers v. Hardwick*, 478 U.S. 186 (1986), *overruled by*

*Lawrence v. Texas*, 539 U.S. 558 (2003).

The State cites decisions said to "recognize that [*Baker*] controls" (ECF-29-

1 at 11-12).  These citations are *dissenting* opinions or *pre-date Windsor.*  Four

U.S. Courts of Appeal – the Second, Fourth, Seventh, and Tenth Circuits – and

virtually every district court to consider the question since *Windsor* have held that

doctrinal developments have rendered *Baker* meaningless as precedent.  *See*

*Windsor v. United States*, 699 F.3d 169, 178 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675

(2013); *Bostic*, 2014 U.S. App. LEXIS 14298, at *34-35 (collecting cases); *Baskin*,

Nos. 14-2386, at *14; *Kitchen*, 755 F.3d at 1204-08; *Brenner*, 2014 U.S. Dist.

LEXIS 116684, at *28-30.[3]

The 42 years since *Baker* have witnessed seismic changes to the

constitutional landscape.  For example, since *Baker* the Supreme Court has held

that:

---

[3]    The only post-*Windsor* federal decisions upholding marriage bans did not
consider the issue of doctrinal developments.  *See Merritt v. Att'y Gen.*, 2013 U.S.
Dist. LEXIS 162583 (M.D. La. 2013) (adopting magistrate's report dismissing *pro
se* complaint); *Robicheaux v. Caldwell*, 2014 U.S. Dist. LEXIS 122528, at *25
(E.D. La. 2014) (not reaching *Baker*'s viability).  For the reasons discussed in this
Opposition and in the avalanche of contrary authority, those two outlier decisions
were wrongly decided.

- Classifications based on sex and the marital status of one's parents are suspect and require heightened scrutiny, a level of review articulated only post-*Baker*. *See Craig v. Boren*, 429 U.S. 190, 197-98 (1976); *Frontiero v. Richardson*, 411 U.S. 677, 682 (1973); *Lalli v. Lalli*, 439 U.S. 259, 264-65 (1978).

- The Fourteenth Amendment protects fundamental liberty interests even if the rights at issue were not well-recognized and were commonly infringed by the states at the time of ratification. *See, e.g.*, *Planned Parenthood v. Casey*, 505 U.S. 833, 847-48 (1992).

- The government violates the Equal Protection Clause when it "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else." *Romer v. Evans*, 517 U.S. 620, 635 (1996).

- Adult lesbians and gay men have the same liberty interest in private sexual and family relationships as heterosexuals. *Lawrence*, 539 U.S. at 577-78. Writing in dissent, Justice Scalia noted that this ruling "dismantle[d]" the constitutional impediment to marriage by partners of the same sex:  "If moral disapprobation of homosexual conduct is 'no legitimate state interest' for purposes of proscribing that conduct, … what justification could there possibly be for denying the benefits of marriage to homosexual couples exercising '[t]he liberty protected by the Constitution'?"  *Id*. at 604-05.

17

- DOMA § 3 violated due process and equal protection guarantees by denying federal recognition of lawful marriages between couples of the same sex. *Windsor*, 133 S. Ct. at 2693.  DOMA improperly instructed "all persons with whom same-sex couples interact, including their own children, that their marriage is less worthy than the marriages of others."  *Id*. at 2696.  The decision prompted a dissenting Justice Scalia to state:  "How easy it is, indeed how inevitable, to reach the same conclusion with regard to state laws denying same-sex couples marital status."  *Id*. at 2709.

- In *Windsor*, the Court also applied a heightened level of review, calling for "careful consideration" of laws, like the Marriage Bans, singling out lesbians and gay men for special disadvantage.  *Id.* at 2692; *see also SmithKline Beecham Corp. v. Abbott Labs*, 740 F.3d 471, 481 (9th Cir. 2014) ("*Windsor* review is not rational basis review.  In its words and its deed, *Windsor* established a level of scrutiny for classifications based on sexual orientation that is unquestionably higher than rational basis review.").[4]

---

[4]     After championing the summary dismissal in *Baker* as controlling, the State asks the Court to believe that *Romer* and *Lawrence* – decisions on the merits after briefing and oral argument – are not "significant developments" given their narrow interpretation by the Eleventh Circuit (ECF-29-1 at 14).  Justice Scalia's dissent in *Lawrence* says otherwise, and *Windsor* supersedes prior understandings of equality and liberty guarantees for same-sex couples and their children, "withdraw[ing] from Government the power to degrade or demean in the way [DOMA] does." 133 S. Ct. at 2695; *see also Brenner*, 2014 U.S. Dist. LEXIS 116684, at *28-30 (*Baker* does not control challenge to Florida's marriage bans).

By accepting *certiorari* in *Windsor* and in *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013), a direct challenge to a state's denial of marriage rights to same-sex couples, the Supreme Court confirmed that issues of marriage between same-sex partners present a substantial federal question.  The Second Circuit's *Windsor* opinion held that *Baker* was no longer binding.  699 F.3d at 178.  And despite vigorous arguments to the contrary before the Supreme Court, its *Windsor* opinion did not even mention *Baker*.  "The Supreme Court's willingness to decide *Windsor* without mentioning *Baker* speaks volumes regarding whether *Baker* remains good law."  *Bostic*, 2014 U.S. App. LEXIS 14298, at *36.  Likewise, when counsel invoked *Baker* at the *Hollingsworth* oral argument, Justice Ginsburg responded: "*Baker v. Nelson* was 1971.  The Supreme Court hadn't even decided that gender-based classifications get any kind of heightened scrutiny…. [S]ame-sex intimate conduct was considered criminal in many states in 1971, so I don't think we can extract much from Baker against Nelson."  2013 U.S. Trans. LEXIS 40, at *10.

These developments indicate the Supreme Court's "willingness to reverse or reconsider a prior opinion with such clarity" that lower courts repeatedly have declined to follow *Baker*.  *Hardwick*, 760 F.2d at 1209.  As Justice Scalia confirmed in both *Lawrence* and *Windsor*, the Supreme Court has more than "suggest[ed] that a legal issue once thought to be settled by a summary action should now be treated as an open question."  *Id*.

19

The State cannot deny these doctrinal developments.  It turns instead to two arguments the Eleventh Circuit has refuted:  that *Hicks* is *dicta* and that only the Supreme Court can vitiate a summary dismissal (ECF-29-1 at 12-13).  In *Hardwick*, the Eleventh Circuit instructed lower courts how to interpret the doctrinal developments language of *Hicks,* thus refuting any notion that the *Hicks* language should be disregarded as *dicta*.  It also confirmed that lower courts could decide whether, "without directly mentioning the earlier case," the Supreme Court had "suggest[ed] that a legal issue once thought to be settled by a summary action should now be treated as an open question."  760 F.2d at 1209.  That was the point in *Hicks*:  to tell lower courts not to follow summary dismissals rotely in the face of intervening doctrinal developments.[5]

## II.   THE AMENDED COMPLAINT STATES CLAIMS FOR VIOLATIONS OF DUE PROCESS AND EQUAL PROTECTION

To state a claim under 42 U.S.C. § 1983, a "plaintiff must make a prima facie showing of two elements:  (1) that the act or omission deprived plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law."  *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171,

---

[5]   The State also suggests that *Hicks*'s instruction did not survive *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989), and *Agostini v. Felton*, 521 U.S. 203 (1997) (ECF-29-1 at 12-13).  But those cases concerned opinions on the merits, not summary dismissals.  The Tenth Circuit rejected the same argument on that basis.  *Kitchen*, 755 F.3d at 1232.

1174 (11th Cir. 1993) (quotation omitted).  The State does not demonstrate that the Plaintiffs fail to state a plausible claim.

**(A)**     **The Amended Complaint States A Due Process Claim**

The State acknowledges that the Due Process Clause of the Fourteenth Amendment guarantees "fundamental rights comprised within the term liberty [that] are protected by the Federal Constitution from invasion by the States" (ECF-29-1 at 20).  The State also acknowledges that Due Process has a "substantive component" that provides "heightened protection against government interference with certain fundamental rights and liberty interests" (*Id.*).

The Amended Complaint alleges that the State has deprived Plaintiffs of the fundamental right to marry and to have their lawful marriages in other states recognized, as well as other fundamental rights to privacy, personal dignity, and autonomy, including each individual's rights to family integrity and association. (ECF-37 ¶¶97-98).  The Amended Complaint also alleges in detail that Georgia's Marriage Bans serve no legitimate interest, let alone an important or compelling interest (*Id.* ¶74).  Plaintiffs allege, for example, that excluding same-sex couples from marriage and refusing to recognize lawful marriages entered elsewhere by same-sex couples does nothing to protect or enhance the rights of different-sex couples; that protection of the public fisc does not justify the State's invidious distinctions among classes of its citizens; that thirty years of research shows that

21

the State's interest in child welfare is harmed rather than furthered by excluding same-sex couples from marriage; that numerous courts, after motions on the merits or trials with expert testimony, have found there is no rational basis to favor parenting by heterosexual couples over parenting by gay or lesbian couples; that excluding same-sex couples from marriage in fact harms the couples' children; and that the State's interest in the welfare of children of same-sex couples is equal to its interest in the welfare of children of different-sex couples (*Id.* ¶¶75-85).  Taking these allegations as true, as this Court is required on a motion to dismiss, Plaintiffs state a plausible claim for relief.

The State makes two arguments.  *First*, the State argues that there is no fundamental right to "same-sex marriage" and that the courts must exercise restraint in recognizing new fundamental rights (ECF-29-1 at 21-31).  But Plaintiffs do not allege a right to "same-sex marriage"; Plaintiffs allege a fundamental right to *marriage*, and the State does not and cannot argue that this fundamental right does not exist.  *Second*, the State argues, asserting a short list of supposedly legitimate interests, that the Marriage Bans are subject to and survive rational basis review (*Id*. at 31-33).  That is a defense on the merits, not an argument that Plaintiffs have no plausible claim for relief.  Plaintiffs' detailed and factual allegations that the Marriage Bans serve no legitimate state interest, under

22

*any* standard of review, must be taken as true.  And in any event, the arguments do not show that Plaintiffs have failed to state a plausible claim.

*First*, the State contends that the fundamental right to marriage "does not encompass the right to marry a person of the same sex" (ECF-29-1 at 20-21).  But the "freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."  *Loving*, 388 U.S. at 12; *accord, Zablocki v. Redhail*, 434 U.S. 374, 383 (1978).  As the laws of 19 states and the District of Columbia show, neither "*same-sex* marriage licenses" nor "*same-sex* marriage laws" exist (ECF-37 ¶15).  There are only *marriage* licenses and laws regulating *marriage*.

The Supreme Court has consistently refused to narrow the scope of the fundamental right to marry to apply only to those individuals who have always enjoyed it.  There is no more a right to "same-sex marriage" than there is a right to "interracial marriage," *Loving*, 388 U.S. 1, or to "prisoner marriage," *Turner v. Safley*, 482 U.S. 78 (1987).  And neither interracial marriages nor marriages to inmates were included in the notion of "traditional marriage."  *See Casey*, 505 U.S. at 847-48 ("interracial marriage was illegal in most States in the 19th century"); *Turner*, 482 U.S. at 94-95 (rejecting contention that prisoners are not deprived "a constitutionally protected right" because "a different rule" should obtain "in a prison forum"), and 96 (citing "incidents of marriage, like the religious and

personal aspects of the marriage commitment," that still apply despite extensive restrictions on prisoners' spousal relationships).[6]

Indeed, the Supreme Court has rejected the use of semantics to define gay people out of liberties shared by all.  As the Court observed, the threshold flaw of *Bowers* was its characterization of the inquiry as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy."  *Lawrence*, 539 U.S. at 566-67, *quoting Bowers*, 478 U.S. at 190.  *Bowers* thus "fail[ed] to appreciate the extent of the liberty at stake," *Lawrence*, 539 U.S. at 567.  Similarly, "the Court's holding in *Windsor* demonstrates that a provision labeled a 'definition' is not immune from constitutional scrutiny."  *Kitchen*, 755 F.3d at 1216; *see also Bostic*, 2014 U.S. App. LEXIS 14298, at *46 ("*Lawrence* and *Windsor* indicate that the choices that individuals make in the context of same-sex relationships enjoy the same constitutional protection as the choices accompanying opposite-sex relationships.").

Moreover, "[h]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry."  *Lawrence*, 539 U.S. at

---

[6]     The marriage right traditionally did not include a right to remarry after divorce.  That changed with *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971) (due process prohibits conditioning divorce on payment of fee, operating as "prohibition against remarriage" for indigents).  Similarly, after *Zablocki v. Redhail*, 434 U.S. 374 (1978), the right to marry could not be withheld based on parents' unwillingness or inability to support their existing children.  *See Kitchen*, 755 F.3d at 1210-11.

572 (quotation omitted).  "Fundamental rights, once recognized, cannot be denied to particular groups on the ground that these groups have historically been denied those rights."  *Baskin*, 2014 U.S. Dist. LEXIS 86114, at *24 (quotation omitted).  The classic example is *Loving*, where the Court held that anti-miscegenation laws violated the fundamental right to marry despite a long tradition of excluding interracial couples from marriage.  *See Casey*, 505 U.S. at 847-48; *Lawrence*, 539 U.S. at 577-78 ("neither history nor tradition could save a law prohibiting miscegenation from constitutional attack").

The State further contends that "*Windsor* did not announce a new fundamental right.  The language and reasoning of *Windsor* are inconsistent with the *Glucksberg* analysis for identifying a fundamental right" (ECF-29-1 at 25, *citing Washington v. Glucksberg,* 521 U.S. 702, 720-21 (1997)).  That argument is classic misdirection.  *Glucksberg* and its progeny hold that courts must carefully define newly identified fundamental rights, not that courts may limit well-established fundamental rights based on who seeks to exercise those rights.  "[T]he right to marry is of fundamental importance for *all* individuals."  *Zablocki*, 434 U.S. at 384 (emphasis added); *see Kitchen*, 755 F.3d at 1209; *Obergefell*, 962 F. Supp. 2d 968, 982 n.10 (reviewing Supreme Court cases holding that "a fundamental right, once recognized, properly belongs to everyone").

Fundamental rights belong to all people because they help define the "attributes of personhood." *Casey*, 505 U.S. at 851.  The State concedes that lesbians and gay men share these attributes with their heterosexual neighbors, colleagues, and family members (ECF-29-1 at 8, acknowledging the "love that Plaintiffs articulate for their partners and children is clear, as are their contributions to our society").  *Glucksberg* is "irrelevant" and "inapplicable" because it "applies only when courts consider whether to recognize new fundamental rights," and is not implicated when same-sex, like interracial, couples seek access to the established right to marry.  *Bostic*, 2014 U.S. App. LEXIS 14298, at *42-43.[7]

The State also contends that the fundamental right to marry does not encompass the right to marry the person of one's choice (ECF 29-1 at 21 n.6).   But the freedom to marry "resides with the individual," and is meaningful precisely because of the right to choose one's life partner.  *Loving*, 388 U.S. at 12; *see also Hodgson v. Minnesota*, 497 U.S. 417, 435 (1990) ("[T]he regulation of constitutionally protected decisions, such as where a person shall reside or whom he or she shall marry, must be predicated on legitimate state concerns other than

---

[7]     The State's reliance on *Williams v. Att'y Gen. of Alabama*, 378 F.3d 1232 (11th Cir. 2004), and *Doe v. Moore*, 410 F.3d 1337 (11th Cir. 2005), is unavailing for the same reason.  Those cases presented questions about defining the scope of rights *not* previously recognized:  the right to use sexual devices and the right to avoid sex offender registration.  Neither involved an established fundamental right denied only to one minority group.

disagreement with the choice the individual has made"); *Roberts*, 468 U.S. at 620 ("[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse"); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974) (the Due Process Clause protects "freedom of personal choice in matters of marriage and family life").

Thus, the State's exegesis of the need for restraint in identifying "new fundamental rights" and its claim that neither *Lawrence* nor *Windsor* identified such a right ignore years of Supreme Court jurisprudence (ECF-29-1 at 22-28). The right that Plaintiffs seek to vindicate is the same "vital personal right[]" to marry identified years before those decisions. *Loving*, 388 U.S. at 12. As Justice Kennedy explained, because "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress," we do not confine fundamental rights to their historically-recognized bounds. *Lawrence*, 539 U.S. at 579. The founders were not "more specific" because they did not "presume" to "know[] the components of liberty in its manifold possibilities," allowing future generations to "invoke its principles in their own search for greater freedom." *Id.* at 578-79.

*Second*, the State argues that the Marriage Bans survive rational basis review (ECF-37 at 31-33). The Marriage Bans are subject to strict scrutiny because Georgia deprives same-sex couples of the fundamental right to marry and denies

27

recognition to lawful marriages performed elsewhere.  *See Kitchen*, 755 F. 3d at 1218-19.  But even if rational basis review applied, the Amended Complaint is more than sufficient.

The State's cursory argument lists a handful of purported State interests: encouraging childrearing in heterosexual households; "ensuring legal frameworks for protection of children of relationships where unintentional reproduction is possible"; "ensuring adequate reproduction"; and "fostering a child-centric marriage culture that encourages parents to subordinate their own interests to the needs of their children" (ECF-29-1 at 32-33).

Similar parenting-related justifications were deemed so insubstantial in *Windsor* that the majority did not even give them a response beyond confirming that DOMA furthered "no legitimate purpose."  133 S. Ct. at 2696; *see* BLAG *Windsor* Brief, 2013 U.S. S. Ct. Briefs LEXIS 280, at *80-82.  Instead, the Court emphasized the profound harms inflicted on same-sex couples' children when the law denies their families the protections of marriage and brands their families as second-class.  133 S. Ct. at 2694.

As numerous lower courts have likewise found, the State's purported child-centered rationales cannot survive even the most glancing level of review because excluding same-sex couples from marriage does not advance those interests in any way.  *See, e.g.*, *Baskin*, Nos. 14-2386, at *38 (finding these rationales "not only

conjectural; they are totally implausible"); *Kitchen*, 755 F.3d at 1223 ("it is wholly illogical to believe that state recognition of the love and commitment between same-sex couples will alter the most intimate and personal decisions of opposite-sex couples"); *Bostic*, 2014 U.S. App. LEXIS 14298,  at *63 ("excluding same-sex couples from marriage due to their inability to have unintended children makes little sense"); *Brenner*, 2014 U.S. Dist. LEXIS 116684, at *26 ("the notion that procreation is an essential element of a Florida marriage blinks reality"); *De Boer*, 973 F. Supp. 2d at 771-72 ("There is … no logical connection between banning same-sex marriage and providing children with an 'optimal environment' or achieving 'optimal outcomes.'"); *Love*, 989 F. Supp. 2d at 548 (arguments about procreation and birth rates are "not those of serious people").  To the contrary, the marriage bans *undermine* state interests relating to children by denying same-sex couples' children – including those, like children in the Wurz family, adopted from the State foster care system – the stability and protections of marriage.  *Baskin*, Nos. 14-2386, at *11-13, 21-23, 33; *Kitchen*, 755 F.3d at 1226 (Utah's marriage ban inflicts "palpable harm" and "works against the children of same-sex couples," which "the Supreme Court has unequivocally condemned" in *Windsor*).

The Amended Complaint presents detailed allegations showing that the
Marriage Bans advance no legitimate State interest.[8] Those allegations must be
accepted as true on this Motion, and, indeed, have proven conclusive on the merits
in cases across the nation.  Plaintiffs have stated a due process claim.

**(B)**     **The Amended Complaint States An Equal Protection Claim**

As the State acknowledges, the "Equal Protection Clause of the Fourteenth
Amendment requires the government to treat similarly situated people alike"
(ECF-29-1 at 34).  "[T]o properly plead an equal protection claim, a plaintiff need
only allege that through state action, similarly situated persons have been treated
disparately."  *Thigpen v. Bibb County*, 223 F.3d 1231, 1237 (11th Cir. 2000),
*abrog. other grounds by Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101 (2002).

The Amended Complaint alleges that Plaintiffs, as lesbians and gay men, are
members of a protected class who are otherwise similarly situated to heterosexual

---

[8]      Even when an ostensibly legitimate purpose justifies a law, "[t]he State may
not rely on a classification whose relationship to an asserted goal is so attenuated
as to render the distinction arbitrary or irrational."  *City of Cleburne v. Cleburne
Living Ctr.*, 473 U.S. 432, 446-47 (1985); *see, e.g.*, *U.S. Dep't of Agric. v. Moreno*,
413 U.S.  528, 535-36 (1973) (invalidating law on rational basis review because
"even if we were to accept as rational the Government's wholly unsubstantiated
assumptions concerning [hippies] … we still could not agree … that the denial of
essential federal food assistance … constitutes a rational effort to deal with these
concerns"); *Eisenstadt v. Baird*, 405 U.S. 438, 448 (1972) (invalidating law on
rational basis review because, even if deterring premarital sex is a legitimate
governmental interest, "the effect of the ban on distribution of contraceptives to
unmarried persons has at best a marginal relation to the proffered objective").

citizens; that they have suffered numerous adverse actions, *e.g.*, the exclusion from marriage or from recognition of their lawful marriages, which show they have been treated differently than heterosexuals or based on their gender; and that representatives of Georgia intentionally took these adverse actions under color of state law (ECF-37 ¶¶104-27).  Plaintiffs further allege they are members of a protected class, which subjects the Marriage Bans to heightened scrutiny (*Id*. ¶¶ 115, 126-27).  Plaintiffs also allege that the Marriage Bans prevent them from exercising fundamental rights that heterosexual Georgians can enjoy, requiring strict scrutiny as a matter of equal protection as well as due process (*Id*. ¶¶127). And, in any event, as discussed above, the Amended Complaint asserts facts showing that these laws do not withstand even rational basis scrutiny because they do not advance any legitimate governmental interest (*Id.* ¶¶110-15).  Taking these allegations as true on this Motion to Dismiss, Plaintiffs state a plausible claim for relief for violation of the equal protection guarantee.

Although the State acknowledges that the Marriage Bans "may have the effect of distinguishing based on sexual orientation," and that those laws "[a]ffect gays and lesbians more profoundly than they do heterosexuals," the State "does not concede that this necessarily constitutes a classification on the basis of sexual orientation" (ECF-29-1 at 38).  This argument is unavailing.  The Supreme Court has instructed that classifications targeting same-sex couples' intimate

relationships must be understood as targeting lesbians and gay men:  "Our

decisions have declined to distinguish between status [being gay] and conduct

[having a same-sex relationship] in this context."  *Christian Legal Soc'y v.*

*Martinez*, 130 S. Ct. 2971, 2990 (2010) (rejecting similar attempt to save

prohibition that applied only to those who engaged in same-sex conduct with "the

belief that the conduct is not wrong"); *see Lawrence*, 539 U.S. at 575 ("When

homosexual *conduct* is made criminal by the law of the State, that declaration in

and of itself is an invitation to subject homosexual *persons* to discrimination")

(emphasis added); *id.* at 583 (O'Connor, J., concurring) ("[T]he conduct targeted

by this law is conduct that is closely correlated with being homosexual.  Under

such circumstances, [the] law is targeted at more than conduct.  It is instead

directed toward gay persons as a class.").  No court to examine a marriage ban

since *Windsor* has disagreed.

The State interprets a pre-*Windsor* decision, *Lofton v. Sec'y of Dep't of*

*Children & Family Servs.*, 358 F.3d 804, 817 (11th Cir. 2004), to hold that "sexual

orientation is not a suspect classification" and to mandate exceedingly deferential

rational basis review (ECF-29-1 at 38).  *Lofton* does not control.  Its decade-old

reference to the scrutiny given sexual orientation classifications rested solely on

the observation that "all of our sister circuits that have considered the question

have declined to treat homosexuals as a suspect class."  358 F.3d at 818.  The court

conducted no independent examination of the traditional hallmarks warranting heightened scrutiny:  a history of discrimination against a group based on a trait that does not diminish one's ability to contribute to society.  *See Baskin*, Nos. 14-2386, at *7-11; *Windsor*, 699 F.3d at 181.  The court did not consider other potentially relevant factors; for example, whether the trait is immutable or beyond one's control, and whether the targeted group is a minority or relatively politically powerless.  *See DeLeon*, 975 F. Supp. 2d at 650; *Wolf*, 986 F. Supp. 2d at 1012.  Indeed, *Lofton*'s entire discussion of the matter is the one sentence quoted above.

The basis for that sentence has disappeared.  Since *Windsor*, numerous courts have concluded that heightened scrutiny applies to classifications based on sexual orientation.   *See Wolf*, 986 F. Supp. 2d at 1012 (collecting cases).  And all four Circuits to consider the applicable level of review since *Windsor* have concluded that heightened scrutiny is warranted on equal protection or due process grounds.  *See Baskin*, Nos. 14-2386, at *2-3, 6-7 (holding that sexual orientation classifications are constitutionally suspect as matter of equal protection); *Bostic*, 2014 U.S. App. LEXIS 14298, *46-47 (applying strict scrutiny on due process and equal protection claims because marriage ban infringes fundamental rights); *Kitchen*, 755 F.3d at 1218 (same); *SmithKline*, 740 F.3d at 481 (holding that classifications based on sexual orientation warrant equal protection heightened scrutiny); *see also Windsor*, 699 F.3d at 181-85 (same).

33

The State also relies on *Lofton*'s holding that a purported government preference for childrearing by married heterosexual parents was a rational and legitimate basis for a one-time Florida adoption restriction (ECF-29-1 at 32, *citing Lofton*, 358 F.3d at 819-20).  A Florida appellate court has since held that restriction unconstitutional based on the overwhelming scientific consensus that children raised by same-sex couples are as well-adjusted as those raised by different-sex couples.  *See Fla. Dep't of Children & Families v. Adoption of X.X.G.*, 45 So. 3d 79 (Fla. App. 2010), *aff'g In re Adoption of Doe*, 2008 WL 5006172, at *20 (Fla. Cir. 2008) ("the issue is so far beyond dispute that it would be irrational to hold otherwise").

The State's argument also begs the reality, stated in the Amended Complaint, that the Marriage Bans deny the stability and protections that come with marriage to the many Georgia children *already* being reared by same-sex parents, including the ten children raised by Plaintiff families, while doing nothing to promote the interests of other children in the State (ECF-37 ¶¶ 10, 14, 55, 70).[9]

At the very least, "a [discriminatory] law must bear a rational relationship to a legitimate governmental purpose."  *Romer*, 517 U.S. at 645.  Basic equal protection analysis focuses on whether the State's *exclusion* of a disadvantaged

---

[9]     According to the 2010 U.S. Census, more than 4,000 same-sex couples in Georgia are raising children.  *See* The Williams Institute, *Georgia Census Snapshot: 2010*, available at http://williamsinstitute.law.ucla.edu/wp-content/uploads/Census2010Snapshot_Georgia_v2.pdf (accessed Sept. 3, 2014).

group from a benefit is rationally related to a legitimate governmental interest – not merely on whether a legitimate government interest justifies *inclusion* of the advantaged group.  *See, e.g.*, *Cleburne*, 473 U.S. at 448-50 (focusing on city's interest in *denying* housing for people with developmental disabilities, not merely on its interest in *permitting* housing for others); *Moreno*, 413 U.S. at 534-36 (focusing on government's interest in *excluding* unrelated households from food stamp benefits, not merely its interest in *including* related households*)*; *Eisenstadt*, 405 U.S. at 448-53 (focusing on state's interest in *denying* unmarried couples access to contraception, not merely its interest in *granting* married couples access).

In any event, *Windsor* abrogated *Lofton*'s deferential review paradigm.  As the State observes, *Windsor* "'certainly does not *apply* anything that resembles'" the deferential framework of rational basis review (ECF-29-1 at 28, *quoting* 133 S. Ct. at 2706 (Scalia, J., dissenting)).  Rather, *Windsor* requires at a minimum that the Court give Plaintiffs' claims careful consideration, beyond the deferential review applied in *Lofton*.

The State also says that Plaintiffs are not similarly situated to different-sex couples with respect to procreation (ECF-29-1 at 34).  But that argument was also made in *Windsor* and deemed unworthy of a response.  BLAG *Windsor* Brief, 2013 U.S. S. Ct. Briefs LEXIS 280, at *80.  It has failed in numerous other cases since *Windsor*.  *See*, *e.g.*, *Baskin*, Nos. 14-2386, at *7 (states' claim "that same-sex

35

couples and their children don't *need* marriage because same-sex couples can't *produce* children … is so full of holes that it cannot be taken seriously"); *Bostic*, 2014 U.S. App. LEXIS 14298, at *62-63.

The State further contends that "Georgia's marriage laws do not treat persons of different sex differently" (ECF-29-1 at 35).  But all gender classifications are subject to heightened scrutiny.  *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 136 (1994) ("our Nation has had a long and unfortunate history of sex discrimination…, a history which warrants the heightened scrutiny we afford all gender-based classifications today") (citation and quotation omitted).  The State's argument that sex discrimination is unlawful only when practiced on one gender "as a class" is not the law; for example, the government may not strike jurors based on their sex, even though that practice, as a whole, does not favor one sex over the other.  *Id*. at 140-41.

Courts have held that discrimination against people because they form a life partnership with persons of the same sex is sex discrimination.[10] Sex and sexual orientation "are necessarily interrelated," because entering into an intimate relationship with someone based on their sex "is a large part of what defines an

---

[10]     *See Kitchen*, 961 F. Supp. 2d at 1206 (Utah's marriage ban involves sex-based classifications), *aff'd on other grounds*, 755 F.3d 1193; *Perry*, 704 F. Supp. 2d at 996; *Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 982 n.4 (N.D. Cal. 2012), *app. dismissed*, 724 F.3d 1048 (9th Cir. 2013); *In re Balas*, 449 B.R. 567, 577-78 (Bankr. C.D. Cal. 2011); *In re Levenson*, 560 F.3d 1145, 1147 (9th Cir. EDR Op. 2009); *Baehr v. Lewin*, 852 P.2d 44, 67-68 (Haw. 1993).

individual's sexual orientation."  *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 996 (N.D. Cal. 2010); *Golinksi*, 824 F. Supp. 2d at 982 n.4.  The Marriage Bans, which prohibit lesbians and gay men from marrying or having their lawful marriages recognized because they have life partners of the same sex, therefore constitute "discrimination based on sex" as well as sexual orientation.  *Perry*, 704 F. Supp. 2d at 996.  The exclusion of couples of the same sex from marriage also reflects stereotyped notions of the proper roles of men and women in marriage and the family, which the Supreme Court has held constitutionally impermissible. Gender classifications "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females."  *U.S. v. Virginia*, 518 U.S. 515, 533 (1996); *see also Califano v. Webster*, 430 U.S. 313, 317 (1977).

The State argues that there is "no indication that either sex, as a class, is disadvantaged" by the Marriage Bans (ECF-29-1 at 35).  But the Supreme Court rejected the same argument in the context of challenges to racial discrimination. *Loving* thus "reject[ed] the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations."  388 U.S. at 8; *see McLaughlin v. Florida*, 379 U.S. 184, 191 (1964) (equal protection analysis "does not end with a showing of equal application among the members of the class defined by the legislation").  Nor can this reasoning be limited to

37

eradicating discrimination targeting African-Americans: "we find the racial classifications in these statutes repugnant to the Fourteenth Amendment, even assuming an even-handed state purpose to protect the 'integrity' of all races." *Loving*, 388 U.S. at 11 n.11.

## **CONCLUSION**

In the final analysis, the State's position is that a majoritarian preference in 2004 to exclude same-sex Georgia couples and their children from the rights and dignity of marriage is immune from judicial review. But "[a] citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." *Lucas v. Forty-Fourth Gen. Assembly of Colo.,* 377 U.S. 713, 736-37 (1964). Plaintiffs allege claims for relief that already have prevailed on the merits in courts around the nation. They are entitled to have their claims heard here. For the foregoing reasons, the Court should deny the State's Motion to Dismiss.

Respectfully submitted this 5th day of September, 2014.

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.

/s/ *Tara L. Borelli*
Tara L. Borelli (Bar No. 265084)
Gregory R. Nevins (Bar No. 539529)
Elizabeth L. Littrell (Bar No. 454949)
730 Peachtree Street, NE, Suite 1070
Atlanta, Georgia 30308
Phone: (404) 897-1880
Fax: (404) 897-1884
tborelli@lambdalegal.org
gnevins@lambdalegal.org
blittrell@lambdalegal.org

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
Susan L. Sommer (*Pro Hac Vice*)
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
Fax: (212) 809-0055
ssommer@lambdalegal.org

BRYAN CAVE LLP

/s/ *William V. Custer*
William V. Custer (Bar No. 202910)
Jennifer D. Odom (Bar No. 549717)
Jennifer B. Dempsey (Bar No. 217536
Luke A. Lantta (Bar No. 141407)
1201 W. Peachtree Street, N.W.
Fourteenth Floor
Atlanta, GA  30309
Phone:  (404) 572-6600
Fax:  (404) 572-6999
Bill.Custer@bryancave.com
Jennifer.Odom@bryancave.com
Jennifer.Dempsey@bryancave.com
Luke.Lantta@bryancave.com

BRYAN CAVE LLP
Douglas E. Winter (*Pro Hac Vice*)
1155 F. Street, NW, Suite 700
Washington, DC 20004
Phone: (202) 508-6000
Fax: (202) 220-7372
dewinter@bryancave.com

WHITE & CASE LLP
David P. Draigh (*Pro Hac Vice*)
Southeast Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Phone: (305) 995-5293
Fax: (305) 358-5744
ddraigh@whitecase.com

*Counsel for Plaintiffs*

## **LOCAL RULE 7.1(D) CERTIFICATE OF COMPLIANCE**

I certify that this pleading has been prepared with Times New Roman font, 14 point, as approved by the Court in N.D. Ga. L.R. 5.1(C).

## **CERTIFICATE OF SERVICE**

I certify that on September 5, 2014, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send email notification to the following attorneys of record. I further certify that all attorneys of record are CM/ECF participants.

| | |
|---|---|
| Tara L. Borelli | William V. Custer |
| Susan L. Sommer (*Pro Hac Vice*) | Douglas E. Winter (*Pro Hac Vice*) |
| Gregory R. Nevins | Jennifer D. Odom |
| Elizabeth L. Littrell | Jennifer B. Dempsey |
| LAMBDA LEGAL DEFENSE AND | Luke A. Lantta |
| EDUCATION FUND, INC. | BRYAN CAVE LLP |
| *Attorneys for Plaintiffs* | *Attorneys for Plaintiffs* |
| | |
| Nels Peterson | David P. Draigh (*Pro Hac Vice*) |
| Devon Orland | WHITE & CASE LLP |
| OFFICE OF STATE ATTORNEY GENERAL | *Attorneys for Plaintiffs* |
| *Attorneys for Defendant Deborah* | |
| *Aderhold* | |
| | |
| Diana L. Freeman | Frank E. Jenkins, III |
| Kaye W. Burwell | Michael Van Stephens, II |
| R. David Ware | Robert L. Walker |
| FULTON COUNTY ATTORNEY'S OFFICE | JENKINS & BOWEN, P.C. |
| *Attorneys for Defendant Hon. Judge* | *Attorneys for Defendant Brook* |
| *Pinkie Toomer* | *Davidson* |

/s/ *William V. Custer*
William V. Custer (Bar No. 202910)