## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**CHRISTOPHER INNISS, et al.,**

   **Plaintiffs,**

  **v.**

**DEBORAH ADERHOLD, et al.,**

   **Defendants.**

**1:14-cv-01180-WSD**

## OPINION AND ORDER

This matter is before the Court on Defendants Deborah Aderhold's

("Aderhold"), in her official capacity as the State Registrar and Director of Vital

Records for the Georgia Department of Public Health, and Monica P. Fenton's

("Fenton"), in her official capacity as Director of System Benefits for the Board of

Regents of the University System of Georgia (collectively, "Defendants"), Motion

to Dismiss Plaintiffs' First Amended Class Action Complaint ("Amended

Complaint") for Injunctive and Declaratory Relief [29, 42].[1]  Defendants move to

---

[1] On July 21, 2014, Aderhold moved to dismiss Plaintiffs' original Complaint [29].
On August 4, 2014, Plaintiffs filed an Amended Complaint [37].  On August 18,
2014, Aderhold and Fenton moved to dismiss the Amended Complaint [42],
adopting and incorporating the Brief in Support of the Motion to Dismiss that
Aderhold filed on July 21, 2014 [29].  On October 22, 2014, Defendants' Motion
to Dismiss was fully briefed [46], and submitted to the Court on October 23, 2014.

dismiss, under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, based on lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted.

## I. BACKGROUND

### A. Facts

#### 1. The Plaintiffs

Plaintiffs Christopher Inniss ("Inniss") and Shelton Stroman ("Stroman") are a same-sex male couple that resides in Snellville, Georgia. They have been together for thirteen years. In 2004, Inniss proposed to Stroman, and the couple decided to live together and adopted J.S.I., a boy who is a nine-year old fourth grader today. Inniss and Stroman seek to obtain a marriage license in Georgia, so that they can be recognized as a committed couple, and to fulfill J.S.I.'s desire that Inniss and Stroman be married like many of his friends' parents.

Plaintiffs RayShawn Chandler ("RayShawn") and Avery Chandler ("Avery") are a same-sex female couple that resides in Jonesboro, Georgia. Avery works as a Police Officer for the Atlanta Police Department ("APD"). She is also a Sergeant in the United States Army Reserve, and, in 2014, deployed for service

---

On November 24, 2014, and November 26, 2014, the parties filed Notices of Supplemental Authority.

in Kuwait. RayShawn is a former Police Officer for the APD, and works as a

flight attendant for Delta Air Lines, Inc. On June 26, 2013, the Chandlers were

married in West Hartford, Connecticut.[2] RayShawn and Avery challenge

Georgia's prohibition on the recognition of out-of-state same-sex marriages.

RayShawn intends to become pregnant through artificial insemination. The couple

alleges that should RayShawn have one or more children, Avery cannot, under

Georgia's marriage laws, be listed as a parent on the birth certificate of any

children born to RayShawn. The couple also alleges that RayShawn would not

qualify for survivor benefits if Avery were killed in the line of duty because

RayShawn is not recognized as Avery's spouse under Georgia's marriage laws.

Plaintiffs Michael Bishop ("Bishop") and Johnny Shane Thomas

("Thomas") are a same-sex male couple that resides in Atlanta, Georgia. Thomas

is a realtor, and Bishop is General Counsel for AT&T Intellectual Property

Corporation. They have been together for seven years. At some point in their

relationship, they adopted T.A.B., a five-year old boy, and M.G.B., a four-year old

---

[2] Same-sex marriage is legal in Connecticut. On October 28, 2008, the Supreme
Court of Connecticut held, under the Equal Protection Clause of Connecticut's
State Constitution, that same-sex couples cannot be denied the right to marry.
See Kerrigan v. Comm'r of Pub. Health, 289 Conn. 135, 141 (Conn. 2008). On
November 12, 2008, Connecticut began to issue marriage licenses to same-sex
couples.

girl. Bishop and Thomas seek to get married to express their devotion to each other, and to obtain the dignity and legitimacy of their relationship for their children.

Plaintiffs Elizabeth Wurz ("Beth") and Krista Wurz ("Krista") are a same-sex female couple that resides in Brunswick, Georgia. Beth is an Associate Professor of English at the College of Coastal Georgia, and Krista is a special education teacher at the Coastal Academy of Georgia. On October 12, 2010, Beth and Krista were married in New Hampshire.[3] Beth and Krista are raising seven children, including five foster children who are classified by the State of Georgia as Special Needs children.

Beth and Krista claim that they cannot jointly adopt their children because Georgia does not recognize their marriage. In 2011, Beth adopted three foster children in the couple's care and, in July 2014, Krista adopted the other two foster children. Beth and Krista allege that Georgia's refusal to recognize their marriage has harmed their children. Krista and her stepson are not covered by Beth's employer-based health insurance plan sponsored by the College of Coastal Georgia because Georgia does not recognize Krista as an eligible spouse. Today, Krista

---

[3] On June 3, 2009, the New Hampshire Legislature voted to recognize and permit same-sex marriages.

and her stepson are covered by her employer-based health insurance plan sponsored by the Coastal Academy of Georgia, but the couple contends that the insurance coverage sponsored by Krista's employer is expensive and inferior to Beth's insurance plan.

On February 13, 2013, Plaintiff Jennifer Sisson ("Sisson") was married to Pamela Drenner ("Drenner") in New York, New York.[4] In 2008, Drenner was diagnosed with ovarian cancer. Sisson took a leave of absence from her employment with Delta Air Lines, Inc. to become Drenner's full-time caretaker. On March 1, 2014, Drenner contracted a serious infection from which she died. On March 2, 2014, Sisson went to a funeral home to make arrangements for Drenner's burial. The funeral home informed her that Drenner could, on her death certificate, be identified only as "never married," "widowed," or "divorced." Georgia law does not allow Sisson to be listed as Drenner's spouse on the death certificate. The space on the death certificate for Drenner's "spouse" is left blank. Sisson seeks to obtain a death certificate that recognizes her marriage to Drenner.

---

[4] On June 24, 2011, the New York State Legislature passed the Marriage Equality Act, which extends the protections, responsibilities and rights of civil marriage to same-sex couples. See N.Y. Dom. Rel. L. § 10-a.

## 2. *The Defendants*

Defendant Aderhold is the State Registrar and Director of Vital Records for the Georgia Department of Public Health. Aderhold is responsible for the registration, collection, preservation, amendment, and certification of birth, marriage, and death certificates issued by the State. She has the authority to prescribe, furnish and distribute vital records forms, including those impacted by the State's prohibition on same-sex marriages.

Defendant Fenton is the Director of System Benefits for the Board of Regents of the University System of Georgia ("Board of Regents"). The Board of Regents selects and implements employer-sponsored health insurance plans for educational institutions in the University System of Georgia, including the College of Coastal Georgia. The Board of Regents restricts insurance coverage to a beneficiary's "legal spouse," as that term is defined under Georgia law. Fenton is responsible for ensuring that the College of Coastal Georgia's health insurance plan complies with State law.

Defendant Brook Davidson ("Davidson") is the Clerk of the Gwinnett County Probate Court. Defendant Probate Judge Pinkie Toomer ("Judge Toomer") is a Probate Court Judge in Fulton County, Georgia. Davidson and Judge Toomer are responsible for issuing marriage licenses in Gwinnett County, Georgia and

Fulton County, Georgia, respectively. Georgia law requires them to comply with O.C.G.A. § 19-3-30(b)(1), which provides that "[n]o marriage license shall be issued to persons of the same sex." See O.C.G.A. § 19-3-30(b)(1). On April 10, 2014, Bishop and Thomas appeared in the Fulton County Probate Court and applied for a marriage license. On April 13, 2014, the Fulton County Probate Court issued an Order denying their application because they are of the same sex. On April 17, 2014, Inniss and Stroman appeared in the Gwinnett County Probate Court and applied for a marriage license. They were denied a marriage license because they are of the same sex.

### 3. *Georgia's Marriage Laws*

In 1996, the state legislature in Georgia enacted O.C.G.A. § 19-3-3.1 to prohibit same-sex marriages in Georgia, and to prevent the recognition of same-sex marriages performed in other States or foreign countries. The statute provides:

> (a) It is declared to be the public policy of this state to recognize the union only of man and woman. Marriages between persons of the same sex are prohibited in this state.

> (b) No marriage between persons of the same sex shall be recognized as entitled to the benefits of marriage. Any marriage entered into by persons of the same sex pursuant to a marriage license issued by another state or foreign jurisdiction or otherwise shall be void in this state. Any contractual rights granted by virtue of such license shall be unenforceable in the courts of this state and the courts of this state shall have no jurisdiction whatsoever under any circumstances to grant a divorce or separate maintenance with respect to such marriage

or otherwise to consider or rule on any of the parties' respective rights arising as a result of or in connection with such marriage.

O.C.G.A. § 19-3-3.1.

In November 2004, Georgia voters ratified a proposed amendment to the State Constitution ("The Amendment"), codified as Georgia Constitution Art. I, § IV, Para. I. The Amendment, approved by 76% of voters, prohibits same-sex marriages in Georgia, and refuses to recognize same-sex marriages performed in other States. The Amendment provides:

> (a) This state shall recognize as marriage only the union of man and woman. Marriages between persons of the same sex are prohibited in this state.

> (b) No union between persons of the same sex shall be recognized by this state as entitled to the benefits of marriage. This state shall not give effect to any public act, record, or judicial proceeding of any other state or jurisdiction respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other state or jurisdiction. The courts of this state shall have no jurisdiction to grant a divorce or separate maintenance with respect to any such relationship or otherwise to consider or rule on any of the parties' respective rights arising as a result of or in connection with such relationship.

GA. CONST. art. I, § IV, para. I.

B.     Procedural History

On April 22, 2014, Plaintiffs filed their two-count Class Action Complaint against Defendants seeking, under 42 U.S.C. § 1983, injunctive and declaratory

relief on behalf of themselves, all unmarried same-sex couples that reside in Georgia, and all same-sex couples lawfully married in other States that reside in Georgia.[5] On August 4, 2014, Plaintiffs amended their Complaint to add Beth and Krista as Plaintiffs, and to name Fenton as an additional defendant.

The Amended Complaint alleges that Georgia's laws prohibiting same-sex marriages, and refusal to recognize same-sex marriages performed in other States, violates the Due Process and Equal Protection guarantees of the Fourteenth Amendment to the United States Constitution. Count I of the Amended Complaint alleges that Georgia's marriage laws violate Plaintiffs' fundamental right to marry, and Plaintiffs' interests in liberty, dignity, autonomy, family integrity and association that Plaintiffs allege are protected under the Due Process Clause of the Fourteenth Amendment. Count II of the Amended Complaint alleges that

---

[5] Plaintiffs have not moved to certify the Class, and Defendants have not addressed whether the Class should be certified. The Court has the discretion to consider Defendants' Motion to Dismiss before determining whether the Class should be certified. See Webster v. Royal Caribbean Cruises, Ltd., 124 F. Supp. 2d 1317, 1321 (S.D. Fla. 2000) (ruling on motion to dismiss prior to considering class certification because "the motion to dismiss may be dispositive, thereby rendering the motion for class certification moot."). The Court has an independent duty to determine whether an action is properly brought as a class action even if the parties do not move to certify the Class. That determination is required to be made at any practicable time prior to final judgment. Martinez-Mendoza v. Champion Int'l Corp., 340 F.3d 1200, 1215-16 (11th Cir. 2003); see also Fed. R. Civ. P. 23(c)(1)(A), Advisory Committee Note (2003).

Georgia's marriage laws violate the Equal Protection Clause of the Fourteenth Amendment because Plaintiffs claim they impermissibly discriminate on the basis of gender, gender stereotypes, and sexual orientation.

Plaintiffs seek a declaration that O.C.G.A. § 19-3-3.1 and Art. I, § IV, Para. I of the Georgia State Constitution, are unconstitutional under the Fourteenth Amendment to the United States Constitution. Plaintiffs request that the Court enjoin enforcement of O.C.G.A. § 19-3-3.1, and Art. I, § IV, Para. I of the Georgia State Constitution, require Georgia to issue marriage licenses to same-sex couples, and compel Georgia to recognize lawful same-sex marriages performed in other States. Plaintiffs also seek an award of costs, expenses, and attorneys' fees under 42 U.S.C. § 1988.

On August 18, 2014, Defendants Aderhold and Fenton moved, under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Amended Complaint for lack of subject-matter jurisdiction, and for failure to state a claim upon which relief can be granted.[6]

---

[6] Defendants Davidson and Judge Toomer did not join in Defendants Aderhold's and Fenton's Motion to Dismiss the Amended Complaint.

## II. DISCUSSION

### A. Legal Standards

#### 1. Motion to Dismiss for Lack of Subject-Matter Jurisdiction

A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure may be either a "facial" or "factual" attack. Morrison v. Amway Corp., 323 F.3d 920, 924-25 n.5 (11th Cir. 2003).[7] Defendants' Motion is a facial attack on the Amended Complaint. In a facial attack on subject-matter jurisdiction, the Amended Complaint's allegations are deemed presumptively truthful, and the "court is required merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1233 (11th Cir. 2008) (citations omitted). The Court thus considers only the allegations in the Amended Complaint to determine whether it has subject-matter jurisdiction over this action.

---

[7] Factual attacks challenge subject matter-jurisdiction in fact, irrespective of the pleadings. Morrison, 323 F.3d at 924-25 n.5. When resolving a factual attack, the Court may consider extrinsic evidence such as testimony and affidavits. Id. In a factual attack, the plaintiff has the burden to prove that jurisdiction exists. Brown v. Cranford Transp. Serv., Inc., 244 F. Supp. 2d 1314, 1317 (N.D. Ga. 2002).

## 2. Motion to Dismiss for Failure to State a Claim

Dismissal of a complaint, pursuant to Rule 12(b)(6), is appropriate "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993).  In considering a motion to dismiss, the Court accepts the plaintiff's allegations as true and considers the allegations in the complaint in the light most favorable to the plaintiff.  See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007); see also Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).  The Court is not required to accept a plaintiff's legal conclusions as true.  See Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)), abrogated on other grounds by Mohamad v. Palestinian Auth., — U.S. —, 132 S. Ct. 1702 (2012).  The Court also will not "accept as true a legal conclusion couched as a factual allegation."  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The complaint, ultimately, is required to contain "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.[8]

---

[8] The Supreme Court explicitly rejected its earlier formulation for the Rule

To state a plausible claim for relief, the plaintiff must plead factual content that "allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "Plausibility" requires more than a "sheer possibility that a defendant has acted unlawfully," and a complaint that alleges facts that are "merely consistent with" liability "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. (citing Twombly, 550 U.S. at 557); see also Arthur v. JP Morgan Chase Bank, NA, 569 F. App'x 669, 680 (11th Cir. 2014) (noting that Conley's "no set of facts" standard has been overruled by Twombly, and a complaint must contain "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."). "A complaint is insufficient if it 'tenders naked assertions devoid of further factual enhancement.'" Tropic Ocean Airways, Inc. v. Floyd, — F. App'x —, No. 14-12424, 2014 WL 7373625, at *1 (11th Cir. Dec. 30, 2014) (quoting Iqbal, 556 U.S. at 678).

"To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions; they are required to allege some specific factual bases for those

12(b)(6) pleading standard: "'[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Twombly, 550 U.S. at 577 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The Court decided that "this famous observation has earned its retirement." Id. at 563.

conclusions or face dismissal of their claims." <u>Jackson v. BellSouth Telecomms.</u>, 372 F.3d 1250, 1263 (11th Cir. 2004); <u>see also</u> <u>White v. Bank of America, NA</u>, — F. App'x —, No. 14-10318, 2014 WL 7356447, at *2 (11th Cir. Dec. 29, 2014) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.") (quoting <u>Oxford Asset Mgmt., Ltd. v. Jaharis</u>, 297 F.3d 1182, 1188 (11th Cir. 2002)).[9]

B.    <u>Analysis</u>

1.    <u>Federal Question Jurisdiction</u>

i.    *Summary Dismissals*

Defendants argue that the Supreme Court's summary dismissal of an appeal from the Minnesota Supreme Court's decision in <u>Baker v. Nelson</u>, 409 U.S. 810 (1972) applies here and requires the dismissal of the Amended Complaint based upon a lack of federal subject-matter jurisdiction. Defendants specifically contend that the Supreme Court's summary dismissal of the appeal in <u>Baker</u> from the Minnesota Supreme Court's decision that neither the Due Process Clause nor the

---

[9] Federal Rule of Civil Procedure 8(a)(2) requires the plaintiff to state "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In <u>Twombly</u>, the Supreme Court recognized the liberal minimal standards imposed by Federal Rule 8(a)(2) but also acknowledged that "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." <u>Twombly</u>, 550 U.S. at 555.

Equal Protection Clause of the Fourteenth Amendment are violated by prohibitions

on same-sex marriage, is binding precedent that requires the Amended Complaint

to be dismissed in this case.

In Baker, the Minnesota Supreme Court rejected the plaintiffs' challenge to

a state law that limited marriage to a man and a woman. Baker v. Nelson, 191

N.W.2d 185 (Minn. 1972). The Minnesota Supreme Court held that the Due

Process Clause of the Fourteenth Amendment is "not a charter for restructuring

[the institution of marriage] by judicial legislation" because "a union of man and

woman, uniquely involving the procreation and rearing of children within a family,

is as old as the book of Genesis." Id. at 186. The Minnesota Supreme Court also

rejected the plaintiffs' Equal Protection challenge to the state law, and held that

"[t]here is no irrational or invidious discrimination" because "in commonsense and

in a constitutional sense, there is a clear distinction between a marital restriction

based merely upon race and one based upon the fundamental difference in sex."

Id. at 187. The United States Supreme Court summarily dismissed an appeal from

the Minnesota Supreme Court by issuing a one-sentence Order stating that "[t]he

appeal is dismissed for want of a substantial federal question." Baker, 409 U.S. at

810.

A summary dismissal binds lower courts regarding the holding challenged.

Hardwick v. Bowers, 760 F.2d 1202, 1207 (11th Cir. 1985), rev'd on other

grounds, Bowers v. Hardwick, 478 U.S. 186 (1986), overruled by

Lawrence v. Texas, 539 U.S. 558 (2003).[10] Summary dismissals may lose their

binding effect when "doctrinal developments indicate otherwise."

Hicks v. Miranda, 422 U.S. 332, 343-44 (1975). The Eleventh Circuit has held

that:

> Doctrinal developments need not take the form of an outright reversal
> of the earlier case. The Supreme Court may indicate its willingness to
> reverse or reconsider a prior opinion with such clarity that a lower
> court may properly refuse to follow what appears to be binding
> precedent. Even less clear-cut expressions by the Supreme Court can
> erode an earlier summary disposition because summary actions by the
> Court do not carry full precedential weight of a decision announced in
> a written opinion after consideration of briefs and oral argument. The
> [Supreme] Court could suggest that a legal issue once thought to be
> settled by a summary action should now be treated as an open
> question, and it could do so without directly mentioning the earlier
> case. At that point, lower courts could appropriately reach their own
> conclusions on the merits of the issue.

Hardwick, 760 F.2d at 1209 (internal citations omitted).

Defendants argue that the "doctrinal developments" doctrine was, after

Hardwick, rejected by the Supreme Court or, if the doctrine is viable, it does not

---

[10] A summary dismissal "should not be taken as an endorsement of the reasoning
of the lower court." Hardwick, 760 F.2d at 1207.

apply here.  To support these arguments, Defendants rely on Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989), and Agostini v. Felton, 521 U.S. 203, 237 (1997).

In Rodriguez, the Supreme Court held: "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of cases, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."  Rodriguez, 490 U.S. at 484.  In Agostini, the Supreme Court stated: "[w]e do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."  Agostini, 521 U.S. at 237.  Based on these cases, Defendants claim that the Supreme Court has abandoned the "doctrinal developments" exception, and the Supreme Court now requires an express rejection of the binding precedent set by a summary dismissal. The Court considers whether Rodriguez and Agostini, which are not cases addressing the precedential impact of summary dismissals, support Defendants' argument here that the "doctrinal developments" doctrine is no longer viable.

Unlike merits decisions, summary dismissals do not "carry the full precedential weight of a decision announced in a written opinion after consideration of briefs and oral argument."  Hardwick, 760 F.2d at 1209; see also

Kitchen v. Herbert, 755 F.3d 1193, 1205 n.2 (10th Cir. 2014) (holding that

Rodriguez did not overrule the "doctrinal developments" exception to the

precedential effect of summary dismissals because Rodriguez dealt with opinions

on the merits). That the Supreme Court requires a direct statement overruling a

full, reasoned opinion is unremarkable. A full, reasoned opinion in our

jurisprudential system, founded on a principle of precedential authority, allows

lawyers and litigants to rely upon a clear, reasoned statement of the law in ordering

their legal and practical decision-making and the conduct of personal and

commercial life. In Rodriguez and Agostini, the Supreme Court appears to say that

when altering the holding in a reasoned, prior opinion and its precedential

authority, that must be done directly, and not by interpretation or implication.

Defendants' reliance on Rodriguez and Agostini is misplaced.

Defendants next argue that the Supreme Court specifically overruled the

Eleventh Circuit's interpretation and application of the "doctrinal developments"

exception in Hardwick. In Hardwick, the Eleventh Circuit held that the Georgia

statute that criminalized sodomy implicated Hardwick's fundamental right to

privacy protected by the Due Process Clause of the Fourteenth Amendment.

760 F.2d at 1210-13. The Supreme Court reversed this decision, but did not

resolve whether the Eleventh Circuit was required to follow the Supreme Court's

summary affirmance in <u>Doe v. Commonwealth's Attorney for City of Richmond</u>, 425 U.S. 901 (1976), which upheld as constitutional the Virginia statute criminalizing sodomy. <u>Bowers</u>, 478 U.S. at 189 n.4. The Supreme Court stated that it chose "to give plenary consideration to the merits [in <u>Bowers</u>] rather than rely on our earlier action in *Doe*." <u>Id.</u> The Defendants contend that the Supreme Court's decision in <u>Bowers</u> to decline to consider whether the Eleventh Circuit was required to follow <u>Doe</u> "rendered the Eleventh Circuit's statements [about the "doctrinal developments" exception in <u>Hardwick</u>] no longer controlling." Reply in Support of Mot. to Dismiss at 4. The Court disagrees.

It is well-established in this Circuit that a district court is bound by a prior decision of a panel in our Circuit. This prior-panel precedent rule requires the Court to follow a decision of the Eleventh Circuit "unless and until it is overruled by [the Eleventh Circuit] *en banc* or by the Supreme Court." <u>United States v. Vega-Castillo</u>, 540 F.3d 1235, 1236 (11th Cir. 2008) (internal quotation marks and citations omitted). "For the Supreme Court to overrule a case, its decision must have 'actually overruled or conflicted with [[the Eleventh Circuit's] prior precedent].'" <u>Id.</u> at 1237. The Supreme Court's decision "must be clearly on point" for it to overrule a prior-panel decision. <u>Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees</u>, 344 F.3d 1288, 1292 (11th Cir. 2003) (citations

omitted). A decision of the Eleventh Circuit on a specific issue remains binding even if the Supreme Court grants certiorari and overrules the Eleventh Circuit's decision on other issues. Id. at 1291. These principles were applied in Garrett.

In Garrett, the Eleventh Circuit relied on Sandoval v. Hagan, 197 F.3d 484 (11th Cir. 1999), to conclude that a State agency waived its Eleventh Amendment immunity for claims under Section 504 of the Rehabilitation Act because it continued to accept federal funds. Id. at 1292. The Eleventh Circuit also held in Sandoval that Title VI of the Civil Rights Act of 1964 created an implied private right of action to enforce certain federal regulations at issue in that case. Id. at 1291.

The Supreme Court reversed the Eleventh Circuit on the implied private right of action to enforce regulations issue. Id. It did not, however, expressly reject the Eleventh Circuit's decision based on the Eleventh Amendment immunity issue, and as a result, the Eleventh Circuit concluded that Sandoval controlled the outcome of the appeal in Garrett because the Supreme Court had not "rejected" the Circuit's Eleventh Amendment analysis, concluding it remained a viable legal principle. Id. The Court concludes that Hardwick's discussion of the "doctrinal developments" exception survived Bowers because the Supreme Court did not reject the Eleventh Circuit's discussion of the exception and its resolution of

whether the exception applied to Hardwick's appeal.  See id.

## ii.    *Doctrinal Developments*

The Eleventh Circuit's opinion in Hardwick is straightforward.  In

Hardwick, the Eleventh Circuit concluded that "doctrinal developments" after Doe

was decided indicated that the questions presented in the plaintiff's complaint were

still open for consideration by the Supreme Court and the Eleventh Circuit.

760 F.2d at 1210.  The Eleventh Circuit noted in Hardwick that the Supreme Court,

in Carey v. Population Servs., 431 U.S. 678 (1977), observed that it had not

""'definitively answered the difficult question whether and to what extent the

Constitution prohibits state statutes regulating [private consensual sexual behavior]

among adults,' n. 17, *infra*, and we do not purport to answer that question now

(brackets in original).'"  Id. at 1209.

The Eleventh Circuit then noted that, six years later, in

New York v. Uplinger, 467 U.S. 246 (1983), the Supreme Court granted certiorari

to consider the constitutionality of state statutes that prohibited consensual sodomy

among adults, but dismissed the writ as improvidently granted, in part because the

decision below was subject to several interpretations, "leaving uncertainty as to the

precise federal constitutional issue the state court decided."  Id. at 1210.  The

Supreme Court, in Uplinger, did not mention Doe "or indicate[] in any way that the

underlying constitutional issue [regarding private consensual sexual behavior] was settled, even temporarily." Id. These post-Doe "doctrinal developments" in Carey and Uplinger led the Eleventh Circuit to conclude that the plaintiff's complaint was improperly dismissed because the noted doctrinal developments denied the Supreme Court's summary affirmance in Doe "of whatever controlling weight it once may have had." Id. The Court reaches a similar conclusion here.

In Baker, the Minnesota Supreme Court rejected the plaintiffs' Due Process challenge to the State's marriage laws on the grounds that "a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis." 191 N.W.2d at 185. The question is whether there are doctrinal developments since the Supreme Court's summary dismissal in Baker that impact the precedential effect of this summary dismissal. The Court concludes that there are.

In Lawrence v. Texas, the Supreme Court rejected the argument that a historical practice alone determines whether a claim is cognizable under the Due Process Clause. 539 U.S. 558, 572 (2003). Although the Supreme Court has often observed that history and tradition are important underpinnings to the finding of a substantive due process right, in Lawrence the Supreme Court held that "[h]istory and tradition are the starting point but not in all cases the ending point of the

substantive due process inquiry." Id. (citations omitted). The summary dismissal in Baker, therefore, does not alone preclude Plaintiffs' substantive due process claim because the Minnesota Supreme Court relied exclusively on history and tradition to dismiss that claim. See Baker, 191 N.W.2d at 185.

The Court next considers if there are doctrinal developments since Baker that urge against application of the summary dismissal doctrine to Plaintiffs' equal protection claim. Plaintiffs contend that Georgia's marriage laws discriminate against them on the basis of sex, sex stereotypes and sexual orientation, denying them equal protection of the laws. In Baker, the Minnesota Supreme Court rejected the plaintiffs' Equal Protection Clause challenge, and held that "there is no "irrational and invidious discrimination" because "in commonsense and in a constitutional sense, there is a clear distinction between a marital restriction based merely upon race and one based upon the fundamental difference in sex." 191 N.W.2d at 187. Sex-based classifications, however, have been subjected to a higher scrutiny standard since the Supreme Court summarily dismissed the plaintiffs' appeal in Baker. See Frontiera v. Richardson, 411 U.S. 677 (1973); Craig v. Boren, 429 U.S. 190 (1976). Doctrinal developments after Baker require federal courts to apply heightened scrutiny to sex discrimination claims. Id. The standard applied by the Minnesota Supreme Court in dismissing the plaintiffs'

equal protection claim has been changed by subsequent Supreme Court precedent that requires courts to subject sex-based classifications to heightened scrutiny. There also are other developments that apply here.

In Romer v. Evans, the Supreme Court struck down a Colorado constitutional amendment that prohibited state laws designed to protect gay, lesbian, and bisexual persons from discrimination. 517 U.S. 620, 624 (1996). The Supreme Court found that the Colorado constitutional amendment lacked a rational relationship to a legitimate state interest because "its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus towards the class it affects." Id. at 632.

In Lawrence, the Supreme Court overruled Bowers to strike down a Texas statute that criminalized same-sex sodomy. 539 U.S. at 578. The Supreme Court held that the substantive component of the Due Process Clause of the Fourteenth Amendment protects the sexual choices of gays and lesbians, and that the State of Texas could not "demean their existence or control their destiny by making private sexual conduct a crime." Id. Romer and Lawrence support that the Supreme Court "has meaningfully altered the way it views both sex and sexual orientation" when

the constitutional claims are brought under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  Bostic v. Schaefer, 760 F.3d 352, 375 (4th Cir. 2014).

The Supreme Court's decision in United States v. Windsor, — U.S. —, 133 S.Ct. 2675 (2013), is the most recent "doctrinal development" to occur after the Supreme Court summarily dismissed the appeal in Baker.  In Windsor, the Supreme Court considered whether Section 3 of the Defense of Marriage Act ("DOMA") violated the Due Process and Equal Protection Clauses of the Fifth Amendment.  Id. at 2695-96.  Section 3 of DOMA adopted a comprehensive definition of marriage to apply to federal laws that addressed marital or spousal status.  Id. at 2683.  DOMA defined "marriage" to mean "only a legal union between one man and one woman as husband and wife," and the word "spouse" in the statute referred "only to a person of the opposite sex who is a husband or a wife."  Id.

In Windsor, the plaintiff filed a tax refund suit against the United States because she did not qualify for a marital exemption from the federal estate tax that excluded from taxation "any interest in property which passes or has passed from the decedent to his surviving spouse."  Id. (citations omitted).  The Supreme Court held that DOMA violated the Due Process and Equal Protection Clauses of the

Fifth Amendment because its "principal purpose" and "necessary effect" was to "demean those persons who are in a lawful same-sex marriage" pursuant to a State's law that legitimized their relationship. Id. at 2695. The Supreme Court concluded that Section 3 of DOMA was unconstitutional because "no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity." Id. at 2696.

The Second Circuit specifically held in its opinion in Windsor that Baker did not apply. Windsor v. United States, 699 F.3d 169, 178-80 (2d Cir. 2012); see also Bostic, 760 F.3d at 374. The Supreme Court did not address Baker in its opinion, and it was not raised or discussed during oral argument. See Bostic, 760 F.3d at 374. The question in our Circuit is whether Baker applies, and if it does, are there doctrinal developments that require the Court to deny the preclusive effect of the summary dismissal doctrine that arises from Baker's summary dismissal.

In Hardwick, the Eleventh Circuit relied on the Supreme Court's failure to address Doe in the Uplinger proceedings to conclude that the constitutionality of a Georgia statute that criminalized sodomy was "open for consideration by the Supreme Court and by [the Eleventh Circuit]." Hardwick, 760 F.2d at 1210. The Supreme Court's refusal to address Baker in its Windsor decision, and the

post-<u>Baker</u> decisions regarding classifications based on gender and sexual

orientation, leads the Court to conclude that "doctrinal developments" impact the

summary dismissal in <u>Baker</u>, and <u>Baker</u> does not require the dismissal of Plaintiffs'

Amended Complaint. [11]

---

[11] With the exception of the Sixth Circuit, the Circuits that have considered the issue have determined that the summary dismissal in <u>Baker</u> does not prevent a federal court from addressing the merits of the plaintiffs' constitutional claims in those cases. <u>See</u> <u>Bostic</u>, 760 F.3d at 374; <u>Kitchen</u>, 755 F.3d at 1208; <u>Baskin v. Bogan</u>, 766 F.3d 648, 660 (7th Cir. 2014); <u>Latta v. Otter</u>, Nos. 14-35420, 14-35421, 12-17668, 2014 WL 4977682, at *11 (9th Cir. Oct. 7, 2014). The Sixth Circuit has interpreted the "doctrinal developments" exception to apply only when the Supreme Court overrules "the decision by name (if, say, *Windsor* had directly overruled *Baker*) or when the [Supreme] Court has overruled the decision by outcome (if say, *Hollingsworth* had invalidated [California's ban on same-sex marriages] without mentioning *Baker*)." <u>DeBoer v. Snyder</u>, 772 F.3d 388, 401 (6th Cir. 2014). The Sixth Circuit's narrow interpretation of the "doctrinal developments" exception is inconsistent with the law in our Circuit. In <u>Hollingsworth v. Perry</u>, — U.S. —, 133 S.Ct. 2652, 2668 (2013), the Supreme Court did not reach the merits of whether an amendment to California's State Constitution that prohibited same-sex marriage violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment because the proponents of the amendment did not have standing to appeal the decision after California officials refused to defend the law. The grant of certiorari in <u>Hollingsworth</u> despite the summary dismissal in <u>Baker</u> undermines Defendants' claim that there is no federal question jurisdiction here. In <u>Hardwick</u>, the Eleventh Circuit inferred that the plaintiff's complaint presented an open question because the Supreme Court granted certiorari in <u>Uplinger</u> despite the summary affirmance in <u>Doe</u>. 760 F.2d at 1210 n.8 (noting that "we may draw appropriate inferences" from an order that grants certiorari as opposed to the denial of certiorari, which generally, has no precedential value).

Defendants' Motion to Dismiss the Amended Complaint for lack of subject-matter jurisdiction based on <u>Baker</u> is denied.

2.    <u>Substantive Due Process and Equal Protection</u>

The Fourteenth Amendment to the United States Constitution provides that "[no] State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  The Due Process Clause has a procedural and substantive component.  <u>Doe v. Moore</u>, 410 F.3d 1337, 1342 (11th Cir. 2005).  Only the substantive component is at issue in this case.

The substantive component of the Due Process Clause protects fundamental rights that are so "implicit in the concept of ordered liberty that neither liberty nor justice would exist if they were sacrificed."  <u>Id.</u> (internal quotation marks omitted).  It protects fundamental rights regardless of the fairness of the procedures implemented by the State.  <u>Id.</u> at 1343.  If a State law infringes on a fundamental right, the law is subject to strict scrutiny and a court upholds the law only if it is "narrowly tailored to serve a compelling state interest."  <u>Id.</u>

Fundamental rights include the rights enumerated in the Bill of Rights to the United States Constitution, "as well as certain 'liberty' and privacy interests implicit in the [D]ue [P]rocess [C]lause and the penumbra of constitutional rights."

Id.  State laws that do not implicate a fundamental right are upheld under the Due

Process Clause if the laws are "rationally related to legitimate government

interests."  Id. at 1345 (internal quotation marks and citations omitted).

The Equal Protection Clause of the Fourteenth Amendment guarantees that

the "sovereign may not draw distinctions between individuals based solely on

differences that are irrelevant to a legitimate governmental objective."

Lofton v. Sec'y of Children & Family Servs., 358 F.3d 804, 817 (11th Cir. 2004).

It requires the State to "treat similarly situated people alike." Campbell v. Rainbow

City, Ala., 434 F.3d 1306, 1314 (11th Cir. 2006).  State laws that burden a

fundamental right or target a suspect class are subject to strict scrutiny under the

Equal Protection Clause.  Lofton, 358 F.3d at 818.[12]  State laws that do not burden

a fundamental right or target a suspect class are upheld if the classification is

"rationally related to a legitimate state interest."  Id.

---

[12] State laws that discriminate on the basis of race are upheld if the racial
classification is narrowly tailored to achieve a compelling governmental interest.
Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty., 122 F.3d 895, 906
(11th Cir. 1997).  Group classifications based on sex or sex stereotypes are subject
to intermediate scrutiny.  Glenn v. Brumby, 663 F.3d 1312, 1315-16 (11th Cir.
2011).  State laws that discriminate on the basis of sex or sex stereotypes are
upheld if the gender classification is "substantially related to a sufficiently
important government interest."  Id. (internal quotation marks and citations
omitted).

*i.* *Fundamental Rights*

Plaintiffs allege that Georgia's marriage laws deprive them of "the fundamental right to marry and to have their lawful marriages in other [S]tates recognized, as well as other fundamental rights to privacy, personal dignity, and autonomy, including each individual's right to family integrity and association." Pls.' Opp. to Defs.' Mot. to Dismiss at 21. Plaintiffs assert that they "do not allege a right to 'same-sex marriage;' Plaintiffs allege a fundamental right to *marriage*, and the State does not and cannot argue that this fundamental right does not exist." Id. at 22 (emphasis in original).

Georgia's marriage laws do not prohibit or impede on Plaintiffs' fundamental right to marry. Georgia's marriage laws prohibit Plaintiffs from marrying a person of the same sex. See GA. CONST. Art. I, § IV, Para. I; O.C.G.A. § 19-3-3.1. Georgia's marriage laws recognize lawful marriages between opposite-sex couples, including those performed in other States. Georgia's marriage laws do not recognize lawful same-sex marriages performed in other States. Id. A careful review of the allegations here disclose that the fundamental right claimed by Plaintiffs is the right to marry a person of the same sex, and same-sex marriage is the precise liberty interest Plaintiffs allege is burdened by Georgia's marriage laws.

The Supreme Court has consistently recognized that freedom to marry a member of the opposite sex is a fundamental right. In Loving v. Virginia, the Supreme Court invalidated a Virginia statute that prohibited white individuals from marrying individuals of another race. 388 U.S. 1, 12 (1967). Relying on the principle that "marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival,"[13] the Court held that the racial classifications embodied in Virginia's anti-miscegenation law deprived "all the State's citizens of liberty without [D]ue [P]rocess of law." Id. (citations omitted).

In Zablocki v. Redhail, the Supreme Court invalidated a Wisconsin statute that required a person obligated to pay child support to obtain permission from a court before he could receive a marriage license. 434 U.S. 374, 383-84 (1978). The Supreme Court held that the Wisconsin statute impermissibly infringed on the plaintiff's fundamental right to marry because the statute required the plaintiff to prove that he had complied with his child support obligations and that the children were unlikely to become "public charges." Id. at 375. In Turner v. Safley, the Supreme Court held that a Missouri regulation that prohibited inmates from

---

[13] Fundamental to the Loving decision is the Supreme Court's statement that opposite-sex marriages and children born within them are "fundamental to our very existence and survival." Loving, 388 U.S. at 12.

marrying infringed on the inmates' fundamental right to marry. 482 U.S. 78, 94-99 (1987).

While these cases did not define the right to marry as "the right to interracial marriage," "the right of people owing child support to marry," and "the right of prison inmates to marry," the commonality among them is that they concern the fundamental right to marry a person of the opposite sex. But see Bostic, 760 F.3d at 377 (declining to narrowly characterize the right at issue as the right to same-sex marriage rather than a general right to marry because the majority in Bostic asserted that Lawrence and Windsor suggest otherwise).

The fact is that Plaintiffs here and in other cases across the country are seeking to apply existing Supreme Court authority to expand the right of opposite-sex marriage to include marriage of persons of the same sex. Put another way, they assert that there is, under the Constitution, a fundamental right of any two adults to marry. The Court declines to extrapolate a fundamental right to marry a person of the same sex from the line of Supreme Court decisions discussed above. The Court concludes that the Supreme Court's decisions regarding the fundamental right to marry are confined to members of the opposite sex—a conclusion that is confirmed by the decisions of the Supreme Court. In Loving, the Supreme Court affirmed the principle that "marriage is fundamental to our very

existence and survival."  388 U.S. at 12.  Five years later, the Supreme Court

summarily dismissed an appeal from a State court decision that denied a marriage

license to same-sex couples "for want of a substantial federal question."

See Baker, 409 U.S. at 810.  While Baker does not limit the Court from reaching

the merits of Plaintiffs' claims today, it does suggest that Plaintiffs' reliance on

Loving, Zablocki and Turner for the right to same-sex marriage is generally

misplaced.  An objective, critical reading of these decisions does not support

Plaintiffs' argument that all persons are entitled to a fundamental right to marry a

person of their choice without State interference.  See DeBoer, 772 F.3d at 411

(observing that "[h]ad *Loving* meant something more when it pronounced marriage

a fundamental right, how could the Court hold in *Baker* five years later that gay

marriage does not even raise a substantial federal question?  *Loving* addressed, and

rightly corrected, an unconstitutional eligibility requirement for marriage; it did not

create a new definition of marriage.").  The Court is thus required to determine

whether there is, as Plaintiffs assert, a fundamental right to marry a person of the

same sex.

To determine whether a fundamental right is recognized under the Due

Process Clause, the Court begins with framing (1) "a careful description" of the

asserted right, and then determines if (2) the asserted right is one of "those

fundamental rights and liberties, which are, objectively, deeply rooted in this

Nation's history and tradition, and implicit in the concept of ordered liberty, such

that neither liberty nor justice would exist if they were sacrificed."

Washington v. Gluksberg, 521 U.S. 702, 720-21 (1997) (internal quotation marks

and citations omitted).

A "careful description of the asserted right" requires the Court to "narrowly

frame the specific facts . . . so that [the Court does] not stray into broader

constitutional vistas than are called for by the facts of the case at hand." Doe,

410 F.3d at 1344 (internal quotation marks and citations omitted). A "careful

description of the asserted right" here is the alleged fundamental right to same-sex

marriage. This "careful description" is consistent with how the Eleventh Circuit

has applied Glucksberg in other contexts. See Williams, 378 F.3d at 1239-42

(reversing the district court's description of the asserted right as a generalized

"right to sexual privacy," and narrowly construing the "putative right at issue as

the right to sell and purchase sexual devices"); Doe, 410 F.3d at 1343-44 (rejecting

broad claims that the Sex Offender Act infringes on the right to family association,

religious practices and employment, and crafting the right at issue as the right of a

sexual offender to "refuse subsequent registration of his or her personal

information . . . and prevent publication of this information on [the State's sexual

offender] website.").  Glucksberg requires a careful, critical review of the claim

asserted.  521 U.S. at 720-21.  That claim here is the claimed fundamental right to

same-sex marriage.

The Court next considers whether the right Plaintiffs claim is one of those

fundamental rights and liberties, which are "deeply rooted in this Nation's history

and tradition, and implicit in the concept of ordered liberty, such that neither

liberty nor justice would exist if they were sacrificed."  Id.  Plaintiffs do not, and

cannot, claim that the right to marry a person of the same sex is "deeply rooted in

this Nation's history and tradition, and implicit in the concept of ordered liberty,

such that neither liberty nor justice would exist if they were sacrificed."  See id.[14]

---

[14] Plaintiffs' reliance on Loving is also misplaced because their interpretation lacks
historical perspective and ignores Loving's constitutional underpinnings.  In
Loving, the Supreme Court held that Virginia's anti-miscegenation law violated
the fundamental right to marry because it was based on a racial classification
"directly subversive of the principle of equality at the heart of the Fourteenth
Amendment."  388 U.S. at 12.  The Supreme Court rejected that debates in the
Thirty-ninth Congress or in the state legislatures, which ratified the Fourteenth
Amendment, supported the constitutionality of criminal statutes based on racial
classifications that applied equally to Caucasians and African-Americans.  Id. at
10.  In doing so, the Supreme Court reasoned that the "clear and *central* purpose of
the Fourteenth Amendment was to eliminate all official state sources of *invidious
racial discrimination* in the States."  Id. (emphasis added).  Plaintiffs do not, and
cannot, claim that the "central purpose" of the Fourteenth Amendment was to
eliminate state statutes that burden the right of any two adults to marry, or in this
case, burden their right to marry a person of the same sex.  Harder still is the
argument that Georgia's marriage laws were enacted because of "invidious
discrimination."  Virginia's anti-miscegenation law was a "measure[] designed to

In <u>Windsor</u>, the Supreme Court confirmed that same-sex marriage is not deeply

rooted in this Nation's history and tradition:

> It seems fair to conclude that, until recent years, many citizens had not
> even considered the possibility that two persons of the same sex might
> aspire to occupy the same status and dignity as that of a man and
> woman in lawful marriage. For marriage between a man and a
> woman no doubt had been thought of by most people as essential to
> the very definition of that term and to its role and function throughout
> the history of civilization.

<u>Windsor</u>, 133 S.Ct. at 2689.

The Court concludes that the Amended Complaint fails to allege "any

evidence of a history and tradition of *affirmative* protection" of the right to marry a

person of the same sex. <u>See</u> <u>Williams</u>, 378 F.3d at 1244 (emphasis in original); <u>see</u>

<u>also</u> <u>Baskin</u>, 766 F.3d at 671-72 (avoiding discussion of a fundamental right to

---

maintain White Supremacy." <u>Id.</u> at 11. The Amended Complaint does not allege
that Georgia's marriage laws are solely motivated by anti-gay bias or that the
prohibition on same-sex marriage is "designed to maintain [Heterosexual]
Supremacy." <u>See</u> <u>id.</u>; <u>see also</u> <u>DeBoer</u>, 772 F.3d at 409 (observing that "assessing
the motives of *all* voters in a statewide initiative strains judicial competence" due
to the large, diverse nature of the electorate, and different reasons for supporting
bans on same-sex marriage) (emphasis in original); <u>Latta</u>, 2014 WL 4977682, at *4
n.8 (noting that ascertaining the actual reasons for enacting laws that prohibit
same-sex marriage is difficult because "[s]ome of the statutory and constitutional
provisions before us were enacted by state legislatures and some were enacted by
voters, and we have been informed by all parties that the legislative histories are
sparse."). The claim of a fundamental right to same-sex marriage does not have
the same footing as the right of the individual to be free of discrimination based on
their race.

same-sex marriage, and applying intermediate scrutiny and rational basis review to invalidate and enjoin Wisconsin's and Indiana's prohibitions on same-sex marriage under the Equal Protection Clause); Latta, 2014 WL 4977682, at *11 (applying heightened scrutiny to invalidate Idaho's and Nevada's prohibitions on same-sex marriage under the Equal Protection Clause without addressing whether same-sex marriage is a fundamental right); Robicheaux v. Caldwell, 2 F. Supp. 3d 910, 923 (E.D. La. 2014) (finding that there is "no fundamental right, historically or traditionally, to same-sex marriage."); Love v. Beshear, 989 F. Supp. 2d 536, 544 (W.D. Ky. 2014) (observing that recognizing a fundamental right to same-sex marriage "would be a dramatic step that the Supreme Court has not yet indicated a willingness to take.").[15]

The Court concludes that Georgia's marriage laws do not implicate a fundamental right to marry a person of the same sex. Because Plaintiffs do not have a fundamental right, under the Due Process Clause, to marry a person of the same sex, the Court is required to review Georgia's marriage laws under the rational basis standard. See Lofton, 358 F.3d at 818; see also infra Section II(B)(2)(iv). Lawrence and Windsor do not require the Court to reach a different

---

[15] The Sixth Circuit, in DeBoer, provided significant historical backdrop to marriage and its practice, including in our country. See 772 F.3d at 411-13.

result.  The Eleventh Circuit has held that <u>Lawrence</u> did not apply strict scrutiny, which is "the proper standard when fundamental rights are implicated, but instead invalidated the Texas statute on rational-basis grounds, holding that it 'furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.'"  <u>Lofton</u>, 358 F.3d at 817 (citations omitted).  In <u>Lofton</u>, the Eleventh Circuit observed that "it is a strained and ultimately incorrect reading of <i>Lawrence</i> to interpret it to announce a new fundamental right."  <u>Id.</u>

<u>Windsor</u> applied "heightened scrutiny" to a federal statute that "unusual[ly] deviate[d] from the usual tradition of recognizing and accepting state definitions of marriage . . . ." 133 S.Ct. at 2693.  DOMA's "unusual deviation" from tradition constituted "strong evidence of a law having the purpose and effect of disapproval" of same-sex couples as a class.  <u>Id.</u>  <u>Windsor</u> did not establish a fundamental right to marry a person of the same sex, and the Supreme Court explicitly stated that "[t]his opinion and its holding are confined to [the] lawful marriages" that were impacted by DOMA.  <u>Id.</u> at 2696; <u>see also</u> <u>infra</u> Section II(B)(2)(ii).

ii.     *Windsor's "Heightened Scrutiny"*

In <u>Windsor</u>, the Supreme Court held that DOMA violated the Due Process and Equal Protection guarantees of the Fifth Amendment because "no legitimate purpose *overcomes* the purpose and effect to disparage and injure those whom the State, by its marriage laws, sought to protect in personhood and dignity." 133 S.Ct. at 2696 (emphasis added). <u>Windsor</u>'s balancing test is incompatible with rational basis review, which requires a statute to be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis" for a legitimate State interest. <u>See</u> <u>Lofton</u>, 358 F.3d at 818. Because of its effect on lawful same-sex marriages in various States, the Supreme Court did not afford DOMA a "presumption of validity" or conceive hypothetical justifications to sustain the validity of DOMA as federal courts typically do on rational basis review. <u>See</u> <u>SmithKline Beecham Corp. v. Abbott Lab.</u>, 740 F.3d 471, 483 (9th Cir. 2014); <u>Baskin</u>, 766 F.3d at 671 (agreeing with the Ninth Circuit that <u>Windsor</u> applied heightened scrutiny to determine whether DOMA violated the Fifth Amendment, and concluding that the "intermediate scrutiny" applied by the Seventh Circuit to discrimination claims based on sexual orientation "converges" with the Ninth Circuit's approach).

The Supreme Court heightened the level of scrutiny in <u>Windsor</u> because "[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." <u>Windsor</u>, 133 S.Ct. at 2692 (internal quotation marks and citations omitted). The Supreme Court repeatedly stated that the regulation of marriage and domestic relations is usually within the exclusive power of the States. <u>Id.</u> at 2691. Because the federal government had "gone beyond the federalism pale and intruded into a province historically monopolized by the States," the Supreme Court examined the purpose and effect of DOMA to determine whether it comported with the Due Process and Equal Protection guarantees of the Fifth Amendment. <u>See</u> <u>Bishop v. Smith</u>, 760 F.3d 1070, 1103 (10th Cir. 2014) (Holmes, J., concurring).

The Supreme Court held that the "history of DOMA's enactment and its own text demonstrate that interference with the equal dignity of same-sex marriages, a dignity conferred by the States in their exercise of sovereign power, was more than an incidental effect of the federal statute. It was its essence." <u>Windsor</u>, 133 S.Ct. at 2693. The Supreme Court also held that the principal effect of DOMA was to "identify a subset of state-sanctioned marriages and make them unequal. The principal purpose was to impose inequality, not for other reasons like governmental efficiency." <u>Id.</u> at 2694. DOMA deprived same-sex couples of

federal benefits, protections under federal law, placed same-sex couples in a "second-tier marriage," and financially harmed and "humiliate[d] tens of thousands of children now being raised by same-sex couples." Id. at 2694-95.

Windsor simply does not hold that sexual orientation is a suspect class subject to heightened scrutiny, and the Supreme Court did not express an opinion on whether a State law that limits marriages to opposite-sex couples should be subjected to heightened scrutiny. The Court declines to divine from Windsor a fundamental right to same-sex marriage or import Windsor's balancing test, applied to the unique impact of DOMA, on a State's marriage statute.

Georgia's marriage laws do not constitute "discriminations of an unusual character" that "especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." Id. at 2692. Unlike DOMA, Georgia's marriage laws were not passed to change the kind and concept of marriage or marriage options that had been observed in the State for decades. Georgia did not allow same-sex marriages or recognize same-sex marriages performed in other States before the legislature enacted O.C.G.A. §19-3-3.1, and the voters amended and ratified Art. I, § IV, Para. I of the Georgia State Constitution. Few other States did until very recently.

Georgia's prohibition on same-sex marriage does not constitute an "unusual deviation" from tradition that warrants heightened scrutiny because "[e]ven before [Georgia] made the [prohibition] explicit, marriage laws that lacked express gender limitations had the same force and effect as bans on same-sex marriage." See Bishop, 760 F.3d at 1105 (Holmes, J., concurring); see also DeBoer, 772 F.3d at 408 (observing that the state laws prohibiting same-sex marriages that were enacted between 2004 and 2006 "codified a long-existing, widely held social norm already reflected in state law."). The Court concludes that Windsor does not require that heightened scrutiny be applied to Plaintiffs' claims based on the Due Process and Equal Protection guarantees of the Fourteenth Amendment.

### iii.  Equal Protection

Plaintiffs allege that Georgia's prohibition on same-sex marriages, and its refusal to recognize lawful same-sex marriages performed in other States, deprives them of equal protection under the law because Georgia's marriage laws discriminate on the basis of sex, sex stereotypes, and sexual orientation.

Plaintiffs contend that Georgia's marriage laws impose sex-based classifications because they prohibit men from marrying other men, and women from marrying other women. This theory has been rejected by a majority of federal courts as an "attempt to 'bootstrap' sexual orientation discrimination into a

42

claim for sex discrimination."  See Wolf v. Walker, 986 F. Supp. 2d 982, 1008

(W.D. Wis. 2014); see also Baskin v. Bogan, 12 F. Supp. 3d 1144, 1159 (S.D. Ind.

2014); Geiger v. Kitzhaber, 994 F. Supp. 2d 1128, 1140 (D. Or. 2014);

Bishop v. U.S. ex rel. Holder, 962 F. Supp. 2d 1252, 1286-87 (N.D. Okla. 2014).[16]

Georgia's marriage laws prevent a person from marrying someone of the same sex.

They do not discriminate against men or women as a class.

---

[16] While these decisions recognize a constitutional right to same-sex marriage on different grounds, and sometimes on several grounds in the same decision, they all hold that prohibitions on same-sex marriage do not discriminate on the basis of sex.  Some of them hold that the fundamental right to marry encompasses the right of individuals to marry a person of the same sex.  See Baskin, 12 F. Supp. 3d at 1157; Wolf, 986 F. Supp. 2d at 1005.  The court in Wolf also determined that sexual orientation is a suspect class subject to heightened scrutiny, and held the same-sex marriage ban unconstitutional on Equal Protection grounds.  See Wolf, 986 F. Supp. 2d at 1016.  The Court has concluded that the fundamental right to marry does not include the right to marry a person of the same sex, and the Eleventh Circuit has held that sexual orientation is not a suspect class subject to heightened scrutiny under the Equal Protection Clause. See Lofton, 358 F.3d at 818.  In our Circuit, classifications based on sexual orientation are scrutinized under the rational basis standard, and the Court is required to analyze whether laws that differentiate based on sexual orientation are rationally related to a legitimate State interest.  Id.  In Geiger and Bishop, the district courts invalidated a State's prohibition on same-sex marriage on rational basis review.  Geiger, 994 F. Supp. 2d at 1141-46; Bishop, 962 F. Supp. 2d at 1287-96.  The Court, however, does not express a view on whether Georgia's prohibition on same-sex marriage meets the rational basis test because, at this stage in the proceedings, Defendants have failed to explain the claimed relationship between its asserted interests and Georgia's marriage laws.  See infra Section II(B)(2)(iv).

Plaintiffs also allege that Georgia's marriage laws perpetuate sex stereotypes "by excluding Plaintiffs from marriage or from being recognized as lawfully married because Plaintiffs have failed to conform to sex-based stereotypes that men should marry women, and women should marry men." Am. Compl. at ¶ 124. With the exception of a concurring opinion from the Ninth Circuit, federal courts have not embraced that sexual orientation discrimination should be viewed as a form of sex stereotyping. See Latta, 2014 WL 4977682, at *18-23 (Berzon, J., concurring); see also Wolf, 986 F. Supp. 2d at 1009 (finding no authority to support that sexual orientation discrimination is a form of sex stereotyping). Even if the Court entertained the theory advanced by Plaintiffs, the Amended Complaint does not plead factual content to support that Georgia's marriage laws perpetuate sex stereotypes. See Iqbal, 556 U.S. at 678. Paragraph 124 of the Amended Complaint is a "legal conclusion couched as a factual allegation." See Twombly, 550 U.S. at 555. The Amended Complaint does not contain factual allegations that explain why Georgia's marriage laws perpetuate sex stereotypes. See id.

Georgia's marriage laws on their face do not allow same-sex couples to marry and do not recognize lawful same-sex marriages performed in other States. Plaintiffs' claim is thus that Georgia's marriage laws discriminate on the basis of sexual orientation. See Lawrence, 539 U.S. at 583 (O'Connor, J., concurring)

("[T]he conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class."). Sexual orientation is not a suspect class in our Circuit. Lofton, 358 F.3d at 818. In our Circuit, classifications based on sexual orientation are scrutinized under the rational basis standard, and the Court is required to analyze whether Georgia's marriage laws are rationally related to a legitimate State interest. Id.

### iv. *Rational Basis Review*

Defendants argue that Georgia's prohibition on same-sex marriages, and its refusal to recognize same-sex marriages performed in other States, is rationally related to the State's interests in encouraging procreation and child welfare. Defendants contend that the State has a legitimate interest in "encouraging the raising of children in homes consisting of a married mother and father;" "ensuring legal frameworks for protection of children of relationships where unintentional reproduction is possible; ensuring adequate reproduction; fostering a child-centric marriage culture that encourages parents to subordinate their own interests to the needs of their children; and exercising prudence before departing from [the traditional] definition of marriage . . . ." Mot. to Dismiss Am. Compl. at 32-33. These conclusory assertions are not supported by specific facts.

While the State is not required to produce evidence that "sustain[s] the rationality of a statutory classification," the asserted State interest "must find some footing in the realities of the subject addressed by the legislation." <u>Heller v. Doe</u>, 509 U.S. 312, 320-21 (1993). Although the Court affords deference to the legislature to determine whether a law is rationally related to a legitimate State interest, the State may not "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary and irrational." <u>City of Cleburne, Texas v. Cleburne Living Ctr.</u>, 473 U.S. 432, 446 (1985) (citations omitted).

At a minimum, the Court is required to "insist on knowing the *relation* between the classification adopted and the object to be obtained" to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." <u>Romer</u>, 517 U.S. at 632-33 (emphasis added). Defendants' Motion to Dismiss the Amended Complaint does not address how Georgia's asserted interests in child welfare and procreation are advanced by the State's prohibition on same-sex marriages, and the State's refusal to recognize lawful marriages performed in other States.[17]

_____

[17] Other federal courts have found that purported interests in procreation and child welfare in other States are not rationally related to the prohibition on same-sex marriage. <u>See</u> <u>Baskin</u>, 766 F.3d at 656 (holding that the prohibition on same-sex

The Amended Complaint specifically alleges that prohibiting same-sex marriages harms the State's interest in child welfare, and that the exclusion does not offer a conceivable benefit to children of opposite-sex couples. Am. Compl. at ¶ 79. It contends that scientific consensus shows that children raised by same-sex couples are as well-adjusted as those raised by opposite-sex couples. Id. at ¶ 82. It asserts further that excluding same-sex couples from marriage humiliates their children, and denies those children the ability to understand the integrity and closeness of their own families without offering any conceivable benefit to the children of opposite-sex couples. Id. at ¶¶ 83-84.

At this stage of the proceedings, the Court is required to accept these facts as true and consider the allegations in the Amended Complaint in the light most favorable to Plaintiffs. In light of these allegations, and Defendants' conclusory allegations of the relationship between Georgia's marriage laws and the State's asserted interests in procreation and child welfare, the Court concludes that Defendants' Motion to Dismiss the Amended Complaint, at this stage of the

marriage is irrational because the States' asserted interest in procreation "is so full of holes that it cannot be taken seriously."); Kitchen v. Herbert, 961 F. Supp. 2d 1181, 1211-1216 (D. Utah 2013); Bishop, 962 F. Supp. 2d at 1287-1296); De Leon v. Perry, 975 F. Supp. 2d 632, 653-56 (W.D. Tex. 2014); Geiger, 994 F. Supp. 2d at 1141-46. Each State is entitled to the court's consideration of the reasons the State advances for the laws it enacts in determining if they are rationally related to the law passed.

litigation, is required to be denied. [18]

---

[18] For the first time in the Reply in Support of their Motion to Dismiss, Defendants explain why the Court should exercise "caution" before redefining marriage to encompass the right to marry a person of the same sex. The Reply does not address or explain the relationship between the marriage bans, and the State's interests in procreation and child welfare listed in the Motion to Dismiss. The Court is not required to consider arguments raised for the first time in a Reply. King v. Warden, No. 13-15362, 2014 WL 6610324, at *2 n.4 (11th Cir. Nov. 24, 2014) ("We will not consider [new] arguments raised for the first time in a reply brief—even with a *pro se* party."). Even if the Court considered Defendants' new arguments, the explanation offered in the Reply does not require dismissal of the Amended Complaint. Defendants rely on the Eleventh Circuit's statement in Lofton that it is not "irrational for the legislature to proceed with deliberate caution before placing adoptive children in an alternative, but unproven, family structure that has not yet been conclusively demonstrated to be equivalent to the marital family structure that has established a proven track record spanning centuries." 358 F.3d at 826. This quote is taken somewhat out of context. In Lofton, the Eleventh Circuit upheld the constitutionality of a Florida statute that prohibited the adoption of children by individuals who "engage in current, voluntary homosexual activity." Id. at 827 (internal quotation marks omitted). The Eleventh Circuit examined scientific studies on "homosexual parenting," and concluded that the studies were "still in their nascent stages and so far have yielded inconclusive and conflicting results." Id. at 826. This factual finding was based on evaluating the state of the scientific consensus more than eleven years ago. "Given this state of affairs," the Eleventh Circuit observed that

> [i]t is not irrational for the Florida legislature to credit one side of the
> debate over the other. Nor is it irrational for the legislature to proceed
> with deliberate caution before placing adoptive children in an
> alternative, but unproven, family structure that has not yet been
> conclusively demonstrated to be equivalent to the marital family
> structure that has established a proven track record spanning centuries.

Id.
The Amended Complaint alleges that "every major professional organization dedicated to children's welfare, including the American Academy of Pediatrics, the American Medical Association, and the American Psychological Association" agrees with the scientific consensus that children raised by same-sex couples are

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [29, 42]

the Plaintiffs' First Amended Class Action Complaint is **DENIED**.


**SO ORDERED** this 8th day of January, 2015.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

indistinguishable from children raised by opposite-sex couples.  Am. Compl. at ¶ 81.  Accepting this allegation as true at this stage of the proceedings, Lofton's deference to legislative judgments based on the "nascent stages" of the scientific research, and the "inconclusive and conflicting results" of that research over a decade ago, is insufficient now to support the rational basis argument presented in Defendant's Reply.